EDMUND WILSON, ATTORNEY-GENERAL, EX REL. RICHARD W. BOOTH, DEFENDANT IN ERROR, v. PATRICK J. McGUINNESS, PLAINTIFF IN ERROR.

Argued June 16, 1909—Decided February 4, 1910.

1. The so-called "Civil Service law" (*Pamph. L.* 1908, *p.* 235) is not vitiated by the fact that with respect to those municipalities which properly adopt its provisions, the act confers a participation in the local government upon a commission not chosen by the several municipalities affected nor from among their citizens or inhabitants.

2. The constitution of this state does not guarantee to the people of the several political divisions of the state the right of local self-government, so as to disable the legislature from providing for the government of those divisions by commissions chosen otherwise than by the people themselves.

3. The constitution of this state, as amended, prohibits the passage of local or special laws, but not of general laws, "appointing local offices (*sic*) or commissions to regulate municipal affairs."

4. In the exercise of the judicial function of declaring an act of the legislature unconstitutional, the ultimate question is not whether the court regards the constitution as permitting the act, but whether the constitution permits the court to disregard the act; the test being not the court's judgment as to the constitutionality of the act but its conclusion as to what judgment was permissible to the legislative branch of the government in which the constitution has reposed the duty of making such judgment as an incident of the lawmaking power; hence, if there be a

permissible doubt as to the existence of the constitutional limitation invoked against the validity of an act, the courts will not declare the act to be contrary to the constitution.

5. The legislature may impose its will as law upon municipalities, but, if some other will is to intervene, it must be that of the people who are to be governed by such municipal law and not an alien will, even though it be that of the governing body for the time being of such municipality.

6. The distinction observed between legislative acts requiring acceptance to become municipal charters (*i. e.,* referendum statutes) and those conferring legislative powers to be exercised (or not) by the local legislative bodies (*i. e.,* statutes delegating powers of local government) ; and the further distinction observed between the acceptance of referendum statutes by the people at the polls and the exercise of delegated power by the local legislative body.

7. A statute in the nature of a supplemental charter that is enacted to take effect upon its adoption by the governing body of a municipality is not a constitutionally enacted law.

8. The so-called "Civil Service law" (*Pamph. L.* 1908, *p.* 235), in so far as its operation is made to depend upon its adoption by the governing body of a municipality, is unconstitutional.

On error to the Supreme Court.

For the plaintiff in error, *Herbert Boggs* and *Frank H. Sommer.*

For the civil service commission, *Edmund Wilson,* attorney-general, and *Nelson B. Gaskill,* assistant attorney-general.

For the defendant in error, *Munn & Church.*

The opinion of the court was delivered by ·

GARRISON, J. This was an information in the Supreme Court in the nature of a *quo warranto,* wherein the issues were by consent of parties tried before Mr. Justice Swayze without a jury. The learned justice found that McGuinness had usurped the office of county collector of the county of Essex to the exclusion of the relator, Booth, who was lawfully entitled thereto. Judgment to that effect was rendered by the Supreme Court upon the *postea,* and this judgment is now under review by writ of error.

The facts were that McGuinness was appointed county col-

lector by the board of chosen freeholders on December 20th, 1906, for a term of two years, expiring December 7th, 1908, and until the appointment of his successor. On December 7th, 1908, the board of freeholders appointed Booth as his successor. McGuinness claimed that he was protected from removal from office by force of the so-called Civil Service law, found in *Pamph. L.* 1908, *p.* 235.

Section 2 of this act provides that "all officers, clerks and employes now in the employ of the state or any municipality adopting this act, coming within the competitive or non-competitive class of the civil service shall continue to hold their offices or employments, and shall not be removed therefrom except in accordance with the provisions of section 24 hereof," &c. Section 24 provides, in a case such as that of McGuinness (if he is in other respects subject to the act), that there shall be no removal from office until the officer shall have been furnished with a written statement of the reasons for such action and been allowed a reasonable time in which to make written answer thereto. Section 30 provides that "any municipality of this state may adopt the provisions of this act by ordinance duly adopted by the governing body of such municipality, or by the petition and vote of the qualified voters of such municipality as hereinafter provided." The next section makes it the duty of the governing body to submit the question of the adoption of the act to the legal voters of the municipality upon being petitioned by a certain number of percentage of the legal voters therein.

This act was approved April 10th, 1908, and took effect immediately. On May 13th, in the same year, the board of freeholders of Essex county undertook to adopt its provisions for that county.

At the trial, some constitutional objections were raised against this enactment, but the trial justice deemed it unnecessary to pass upon them, because he held that section 2, which protects officers, clerks and employes from removal except for cause, does not apply to the case of officers whose terms are established by law; the result being to deprive the incumbent, McGuinness, of the protection of the act. It was also held

that the provisions of the act relative to the appointments of new officers do not apply to such an office as that of county collector, which has a term established by law; and there being no other cloud upon the title of the relator to office, an affirmative judgment establishing his title was added to the judgment of ouster.

Justice Swayze's conclusions were based upon the reasoning set forth in the opinion delivered by him in *Attorney-General, ex rel. McKenzie,* v. *Elliott,* 48 *Vroom* 43.

Upon the first argument of the cause in this court, constitutional questions, as well as questions of construction, were raised, and we, deeming that an ampler discussion of some of the fundamental questions should be had, ordered a reargument upon two questions, viz.:

*First.* Under our constitution and form of government, may the legislature delegate municipal governmental powers to a commission whose members are not chosen from among the citizens or inhabitants of the municipality, even though the exercise of such powers in the municipality is made to depend upon the consent of the voters thereof?

*Second.* Assuming the first question is to be answered in the affirmative, may the legislature delegate the option of acceptance to the governing body of the municipality instead of to the voters thereof?

The first question assumes that the Civil Service law impairs to some extent the privilege of local self-government in those municipalities by which the law is adopted, and raises the query whether this privilege is a privilege merely conferred by the legislature and subject to be withdrawn or limited by the same authority, or whether it is a fundamental right of the people, either because guaranteed by the constitution or because existent anterior to the adoption of that instrument, and persisting in spite of its adoption.

Upon consideration we adhere to the view that the assumption is well founded; that the act does confer upon the civil service commission some powers of municipal government. Respecting such municipalities as adopt the act, section 1 prohibits appointments to and promotions in the civil service

except according to merit and fitness, to be ascertained, as far as practicable, by competitive examinations, and makes all appointments, transfers, reinstatements and promotions subject to the prescriptions of the act. Section 2 has already been adverted to. Section 3 provides that the governor, with the advice and consent of the senate, shall appoint four residents of the state to be civil service commissioners. Section 8 empowers this commission to prescribe, amend and enforce regulations for carrying into effect the provisions of the act, and gives to the commission, among other things, ample power to investigate the action of any person in the paid employ of such municipality in respect to the execution of this act. Section 10 requires all officers of such municipality to conform to, comply with and aid in carrying into effect the provisions of the act and the rules and regulations of the civil service commission, and prohibits the selection or appointment of any person for appointment, employment, promotion or reinstatement except in accordance with the provisions of the act and the rules and regulations prescribed thereunder. Section 11 divides the civil service of such municipality into the classified service and the unclassified service, the former of which is and the latter not subject to the act. Subsequent sections provide for dividing the classified service into four classes, to be designated as the exempt, the competitive, the non-competitive and the labor classes, which classification may be changed from time to time as the commission shall deem proper, and contain elaborate provisions for examinations as to fitness for positions both in the competitive and the non-competitive classes, or in any other class where examinations are required to be held. Section 18 prescribes that such examinations shall be free to all citizens of the State of New Jersey, with the limitations specified in the rules of the commission as to residence, age, sex, health, habits and moral character. By the same section, the commission is to control all examinations, and may designate the examiners, or may themselves act as examiners. Section 20 provides that the commission shall prepare a register of eligibles, and section 21 provides that appointments shall be made from this list. Section 23 permits

the commission to give or withhold consent to the transfer of a person from one office or position in the classified service to another. Section 25 requires the commission to keep an official roster of the classified civil service of each municipality that may adopt the provisions of the act, and requires appointing officers to furnish the materials for the keeping of such roster.

These statutory provisions, and especially those respecting the making, amendment and enforcement of rules and regulations, the control to be exercised by the commission over examinations of applicants, and the discretion about permitting transfers, seem to us to give to the state commission a participation in the government of the several municipalities that adopt the act. If a commission with similar powers were established in and for each separate municipality, it would, beyond doubt, be considered as a branch or department of the municipal government. An instance of such an act is found in *Pamph. L.* 1905, *p.* 227.

It is argued that the object of the Civil Service law of 1908 is to secure efficient administration of the affairs of the municipalities, and that this is a matter of general and not merely of local concern. Conceding this, the question remains, what mode has the legislature adopted for this object? If it had merely adopted a standard of fitness, it would have left the local governmental establishments intact, only setting a rule for their guidance. But in enacting that the maintenance of this standard and the method of its application in particular instances shall be confided to the discretion of a state commission, it has to that extent conferred upon such commission a participation in the local government, and delegated to the commission municipal governmental powers. This feature distinguishes the present act from the Veteran act (*Pamph. L.* 1897, *p.* 142), and from statutes that require appointive boards in the municipalities to be equally divided politically, and the like.

Finding, therefore, that the state civil service board does, by virtue of the act of 1908, have some participation in the local government of the several municipalities that accept the

act, the first inquiry is whether the legislation is vitiated by the fact that the board is not chosen by the municipality nor from among its citizens or inhabitants.

The broad question is whether in our system the right of local self-government is guaranteed to the people of the several political divisions of the state, so that the legislature has no power to provide for the government of those divisions by commissions unless such commission is chosen by the people themselves.

For, upon consideration, we must reject the suggestion that the mere appointment of the members of a commission from among the citizens or inhabitants of the municipality affected is any guarantee of local self-government. In order that self-government may amount to more than a name, it is essential that the officials to whose discretion the powers of government are confided should be representative of the will of the governed; that they should be chosen by the electors of the locality affected, and thus impressed with a sense of direct responsibility to the people.

Nor does the circumstance that the acceptance of the system is made to depend upon the previous consent of the electors of the municipality make the system a system of local self-government. For the principle of local self-government does not contemplate nor permit that the voters by a single election shall take from themselves and those who are to come after them the control over their affairs for an indefinite time.

Accepting, therefore, the phrase "government by commission" as sufficiently describing a method of local government by a governing body not periodically chosen by the local electors, the question is whether it is prohibited by our fundamental law.

Now, the government of this state was established by the people upon the basis of a *written constitution* that assumes to declare certain rights and privileges of the people, to establish and define the right of suffrage, and to distribute the powers of the government into three distinct departments, the legislative, executive and judicial, to define the powers of these departments and impose limitations thereon.

Article 4, section 1, paragraph 1, declares that "The legislative power shall be vested in a senate and general assembly." Section 7 of the same article contains numerous limitations upon the powers of the legislature. The bill of rights contained in article 1 imposes other limitations. But it is significant that the whole of the constitution may be searched in vain for any specific provision guaranteeing to the people the right of local self-government, or prohibiting the legislature from exercising powers of local government through the instrumentality of commissions, however chosen.

Nor is the argument for the existence of the alleged right aided by the language of the preamble: "We, the people of the State of New Jersey, grateful to Almighty God for the civil and religious liberty which He hath so long permitted us to enjoy, and looking to Him for a blessing upon our endeavors to secure and transmit the same unimpaired to succeeding generations, do ordain and establish this constitution." For we are still to look to what is thereafter written for the specific provisions that the people did thereby ordain and establish for the purpose of accomplishing the aim of securing and transmitting the liberties of the people to succeeding generations. It is impossible to so construe the preamble as to write something into the constitution that its framers did not write into it. If we were to write "local self-government" into the constitution because we consider that to have been one of the means by which civil and religious liberty were theretofore enjoyed, we might with equal propriety write into it other things that at one time or another had been conducive to such liberty. And if we were thus to write local self-government into the constitution, in what terms should it be defined? What class of subjects should local government include? Should it include only local police regulations, strictly so called, or should it include schools, municipal water works, lighting works, sewers, and the like? And how is local self-government to be exercised; how are the members of the governing body to be chosen, and what are to be their qualifications? The argument drawn from the preamble, hazy as it is, has the double fault of prov-

ing too much, if it proves anything, and of not defining what it proves.

Nor is the argument aided at all by that section of the bill of rights which reads: "This enumeration of rights and privileges shall not be construed to impair or deny others retained by the people." This manifestly refers to personal and not to governmental rights. For full governmental powers were by this instrument conferred upon the government thereby established. The legislative power was thereby vested in the general legislature, maker of laws for the whole state and for every part of it, without any other limitation than that which the constitution itself in express terms imposes. As pointed out by Justice Van Syckel in *Fritts* v. *Kuhl*, 22 *Vroom* 204, "It is a postulate of a state constitution, which distinguishes it from the federal constitution, that all the power of the people is delegated by it except such parts of it as are specifically reserved."

It is the very essence of government that it shall operate upon those who are unwilling to be governed. The right of local self-government, if it exists, necessarily limits to that extent the powers of the general government; it creates in some sense and to some extent, an *imperium in imperio*. Such a limitation is not to be implied.

Nor does it seem to us that the reference in different parts of the constitution to the cities, townships and counties, either as senatorial or assembly districts, or as judicial districts, or as districts for the purpose of qualifying voters or the like, has anything to do with the question how the internal affairs of these several districts shall be governed.

Our municipalities are not *imperia in imperio;* they are but agencies of the state erected in and for limited parts of its territory, whose governments are established by the state for limited purposes that are of particular concern to the immediate inhabitants, but at the same time are of concern to the people at large.

But counsel for the defendant in error contends that the right of local self-government has existed in the people of New Jersey from time immemorial; that it lies at the founda-

tion of our institutions; that it was not surrendered by the people of the legislature, and is therefore impliedly protected by the constitution.

The whole of the argument favorable to this view of the matter is summed up in the well-known Michigan case of *People* v. *Hurlburt, 24 Mich.* 44. The principal circumstances from which the court there found in the constitution of that state implied restrictions upon the power of the legislature, as regards local government, were, *first,* that the constitution was adopted in view of a well-understood and tolerably uniform system of local government existing from the earliest settlement of the country, and *secondly,* that the liberties of the people were generally supposed to spring from and to depend upon that system.

With respect to the second point, whatever may be the historical origin of the liberties of the people, they seem to be dependent at the present day upon the right of the people to participate by suffrage and by representation in the government which they themselves have established under the guaranties of a written constitution. The absence from such written constitution of any guaranty of local self-government is a cogent argument against its existence as a right.

With respect to the first point, the constitution of this state was not adopted in view of any uniform system of local governments, for we have had none such; certainly no uniform recognition of the right of local self-government that is here contended for.

From the commencement of our existence as a state, under the constitution of 1776 until the adoption of the present constitution in 1844, municipal charters in considerable number were enacted by the legislature without any semblance of uniform adherence to the principle of local self-government. Counsel for plaintiff in error has submitted references to many of the charters of that period, among which the following may be mentioned.

The town of New Brunswick was incorporated in 1784. *Pat. L., p.* 56. The first officers were named in the act; their successors were to be chosen by the qualified voters of the city.

A new charter was substituted in 1801. *Pamph. L., p.* 244. This provided that the mayor, recorder and aldermen should be appointed by the council and general assembly of the state in joint meeting and commissioned by the governor; councilmen to be chosen by the local electors. The city of Burlington was incorporated in 1784. *Pat. L., p.* 70. The mayor, recorder and aldermen were to be appointed by the council and general assembly in joint meeting. The city of Perth Amboy was incorporated in 1784. *Pat. L., p.* 64. The charter provided that the mayor, recorder and aldermen should be appointed by the council and general assembly. So with the charter of the borough of Elizabeth, enacted in 1789. *Pat. L., p.* 94. The city of Trenton was incorporated in 1792. *Pat. L., p.* 116. Its charter provided that the mayor, recorder and aldermen were to be appointed by the general assembly of the state in joint meeting, and commissioned by the governor, with assistants, and a clerk, assessor and collector, to be chosen by the freeholders and inhabitants of the city. The borough of Princeton was incorporated in 1813. *Pamph. L., p.* 7. The mode of choosing the officials was the same as in the case of Trenton. Jersey City was incorporated by *Pamph. L.* 1820, *p.* 86. The first board of selectmen were appointed by the act, to serve until their successors were chosen by the freeholders and other taxable inhabitants. Bordentown was incorporated by *Pamph. L.* 1825, *p.* 25, the first officials being appointed by the act, their successors to be elected. On the other hand, the city of Camden, incorporated in 1828, and the city of Newark, incorporated in 1836, had from the beginning the power of choosing their own officials. *Pamph. L.* 1828, *p.* 193; *Pamph. L.* 1836, *p.* 185.

These charters were likewise different one from the other in respect to the powers that were conferred upon the several municipalities.

We thus see that prior to the adoption of our present constitution no uniform system of local governments had been established, nor was there any general recognition of the right of local self-government. Municipal powers were conferred or withheld as the legislature deemed proper. And the privilege

of local self-government was likewise conferred in some instances and withheld in other instances, according to the wisdom of the lawmakers.

Our present constitution is therefore not to be construed as if it were adopted in view of any established and uniform system of local self-government.

As already observed, that instrument may be searched in vain for any provision guaranteeing that privilege to the people.

The course of legislation under the constitution of 1844, and the character of the amendments that were adopted by the people after thirty years of such legislation, demonstrate, as we think, that the power of the general legislature over local municipal establishments is not hampered by any limitation guaranteeing local self-government.

During thirty years following the adoption of the constitution, the legislature repeatedly established, by special laws, commissions for the government and regulation of local and municipal affairs, without conferring upon the people of the locality the right of selecting the commissioners, and without even prescribing that the commissioners should be resident in the locality particularly affected. In numerous instances the legislature, in the act, designated by name commissioners to exercise powers of local government. In many cases, it is true, the succeeding commissioners were to be chosen by the people, but this was by no means the invariable rule. In some cases vacancies were to be filled by the governor, in other cases by a justice of the Supreme Court, or by the Circuit Court or Court of Common Pleas. Sometimes the act provided that the remaining commissioners should fill vacancies, sometimes that they should only nominate, and that some other body should make the appointment to fill a vacancy. In some notable instances, the people had no direct voice in the choice of either the first or succeeding commissioners.

The acts of legislation referred to are so exceedingly numerous that a detailed reference to them would unduly prolong this opinion. The learned counsel for plaintiff in error, at the request of the court, and with very great labor and

pains, has prepared a list of such acts, the accuracy of which is not questioned. In a footnote we give a sufficient number of references to show the extent to which the legislature, during the period mentioned, exercised the power of regulating municipal affairs by commissioners chosen otherwise than by the people locally concerned.*

*Special acts of the legislature, during the period 1844-1875, establishing and appointing commissions to regulate municipal affairs:

*Pamph. L.* 1852, *p.* 419. An act to authorize the construction of works for supplying Jersey City and places adjacent with pure and wholesome water. This act appoints by name three persons, and the president of the board of aldermen of Jersey City for the time being, and one person to be elected at the next charter election in Jersey City, the first board of water commissioners, and provides that at the charter election to be held in said city in 1855, and every year thereafter, there shall be elected one commissioner.

*Pamph. L.* 1857, *p.* 224. An act authorizing the appointment of commissioners to lay out streets, avenues and squares in that part of Bergen township south of the Morris canal in Hudson county. This act appoints by name five persons as commissioners; provides that in case of death, resignation or refusal to act, the vacancy shall be filled by a vote of a majority of the commissioners, and in order to provide for the payment of the expenses incurred, authorized the commissioners to direct the assessor of the township of Bergen to assess upon the property within the boundaries designated, such sums as they may deem necessary to defray the same.

*Pamph. L.* 1857, *p.* 500. An act to authorize the water commissioners of the city of Hoboken to contract for and introduce water into said city. This act appoints five persons by name, and the chairman of the council of the city of Hoboken for the time being, water commissioners of the city of Hoboken, and authorizes them to make and enter into contracts as may be agreed upon, with the water commissioners for the time being holding office under the act to authorize the construction of works for supplying Jersey City and places adjacent with pure and wholesome water. It confers upon the water commissioners power to issue in the corporate name of the mayor and council of the city of Hoboken, notes, bonds, script or certificates of debt; it directs them to determine by lot their term of office, the term of one to expire each year and the place vacated to be filled at the charter election held in 1858 and subsequent charter elections.

*Pamph. L.* 1857, *p.* 504. An act to authorize the water commissioners of the city of Hudson to contract for and introduce water into said city and to provide for the payment thereof. This act appoints by name four persons and the president of the board of aldermen of the city of Hudson for the time being, the board of water commissioners of the city of Hudson. It is similar in its provisions to the act last above set out.

*Pamph. L.* 1859, *p.* 38. An act to authorize the president and directors of the Trenton water works to convey their works and franchise to the city of Trenton and to provide for the management of said works. This act appoints six persons by name to constitute the first board of water commissioners, who are to determine by lot,

or otherwise, the terms during which they shall hold their office, two for one year, two for two years, and two for three years, to be computed from first day of July after the enactment of the statute. It provides that the common council of the city shall in the month of June, at their regular monthly meeting in the year 1859, and in the same month every year thereafter, elect two commissioners, who shall hold their offices for three years from the first day of July ensuing.

*Pamph. L.* 1859, *p.* 569. An act to regulate the grading of streets and sidewalks, paving and curbing in the town of Mount Holly. The act appoints four persons by name street commissioners, whose duty it shall be to fix, regulate and determine the grade of the streets. One of these persons is appointed for three years, another for two years, another for one year, and it is provided that at each annual meeting thereafter the term of the commissioner that expires shall be filled by a new election.

*Pamph. L.* 1860, *p.* 442. An act to authorize the mayor and common council of the city of Newark to purchase the property of the Newark Aqueduct Company, and creating the Newark aqueduct board. The act appoints by name six persons and the mayor of the city of Newark *ex-officio*, and constitutes them the first board of commissioners; provides that two of them shall remain in office for one year, two for two years and two for three years, and then provides for the annual election by the people of the city of two members of the board, who shall hold office for three years.

*Pamph. L.* 1860, *p.* 625. An act to regulate and determine the care, grading, paving and curbing of the highways, streets, &c., in part of the township of Newton, in the county of Camden. The act appoints by name four persons and constitutes them street commissioners for two years; makes it their duties to fix, regulate and determine the grades of the highways in a part of the township described, and provides for a daily allowance to them; power in them to open and survey, and that all moneys paid for surveying or for the fees of the commissioners shall be raised by a street tax to be .assessed on the estate of the inhabitants of the district.

*Pamph. L.* 1862, *p.* 239. An act authorizing the mayor and common council of the city of Hoboken to raise money by temporary loan for the purpose of giving relief to the families of volunteers engaged in the war service of the United States, appoints by name three persons as commissioners to lay out Market Square in lots and sell and dispose of the same, and provides that any vacancy in the commission shall be filled by the commission itself. It names three persons, together with the mayor of the city of Hoboken and two councilmen, to be a relief committee, and gives them power to fill .vacancies. The proceeds of the sale of lots in Market Square are to be devoted to the payment of the principal and interest on bond given to raise $5,000 for the purpose of the act.

*Pamph. L.* 1864, *p.* 632. An act to authorize the city of Newark to guarantee and assume the payment of certain bonds of the county of Essex and to issue bonds to an amount not exceeding $25,000 for volunteer aid bonds and $300,000 for war bounty bonds. The act appoints the mayor and treasurer of the city of Newark for the time being, together with three other persons named in the act, the commissioners of the sinking fund of 1864 of the city of Newark, and confers upon them powers to fill vacancies. It confers upon the commissioners the control and management of that portion of the said debt specified in the act.

*Pamph. L.* 1865, *p.* 34. An act to authorize the extension of Me-

chanic street, East Orange, Essex county, New Jersey, from Main street to Central avenue. This act appoints by name three persons to be commissioners, and empowers them to survey, lay out and open a street sixty feet wide. The expenses incurred are to be paid by the township of East Orange.

*Pamph. L.* 1866, *p.* 446. An act relating to the assessment and revision of taxes in the city of Newark, appoints four persons by name, together with one to be appointed by the common council as the first board of assessment and revision of taxes; provides subsequently for a board of five persons, four elective and one appointed by the common council.

*Pamph. L.* 1866, *p.* 653. An act to establish a police district in the county of Hudson and to provide for the government thereof. This act requires that on or before April 1st, 1866, and thereafter as may be necessary, the governor shall nominate, and by and with the consent of the senate, appoint from among the electors of Jersey City, three persons as commissioners of police; vacancies that may occur during the recess of the senate shall be filled by the governor by an appointment of a commissioner to serve until the next meeting of the legislature, when, with the advice and consent of the senate, the governor shall fill the unexpired term. Power of removal is vested in the governor.

*Pamph. L.* 1866, *p.* 718. A further supplement to an act entitled an act to authorize the construction of works for supplying Jersey City and places adjacent with pure and wholesome water, approved March 25th, 1852. This act provides that the board of water commissioners of Jersey City shall thereafter consist of four members, the president to be appointed by the governor, with the advice and consent of the senate, a commissioner for the term of five years and until a successor shall be appointed; one member who shall be appointed a commissioner by the governor for the term of four years, and one similarly commissioned for the term of three years, and the president of the common council, who shall be *ex-officio* a member of the board; power of removal of the commissioners commissioned by the governor is vested in the governor upon the written request of two-thirds of the members of the common council, provided that it shall appear satisfactory to the governor that there is good cause for such removal.

*Pamph. L.* 1867, *p.* 210. An act appointing commissioners to lay out streets, avenues and squares in the city of Elizabeth. This act appoints by name five persons, and constitutes them commissioners for the purpose of the act. Limits their terms to two years and directs that any vacancy that shall occur shall be filled by appointment by the governor of the state.

*Pamph. L.* 1867, *p.* 730. A further supplement to the act entitled an act to incorporate Morristown, approved April 6th, 1865. This act relates to the providing of a water-supply for Morristown, appoints four persons and the mayor of the town *ex-officio*, the first board of commissioners; provides that at the charter election in 1868 and every year thereafter, one commissioner shall be elected who shall hold his office for four years.

*Pamph. L.* 1867, *p.* 915. An act to authorize the erection of a town hall and a house of detention in the township of Randolph, in the county of Morris, appoints eight persons commissioners for the purposes of the act, and directs that the money necessary shall be raised by assessment upon the inhabitants and taxable property of the township in such manner as other moneys are raised for township purposes.

*Pamph. L.* 1867, *p.* 976. An act to establish the Long Branch police sanitary and improvement commission. This act provides that upon an application of a taxpayer owning lands within the limits specified it shall be lawful for any justice of the Supreme Court annually, on the first Monday in April, to appoint three persons, being such tax-payers, to be commissioners under this act, who shall hold their office for one year and until others are chosen and duly qualified in their stead. The act provides that the commissioners shall have power to establish ordinances and regulations to prevent vice and immorality and to preserve the public peace and order.

*Pamph. L.* 1867, *p.* 835. An act to authorize the selection and location of certain grounds for a public park for the city of Newark, appoints by name commissioners to select and locate such grounds in the city of Newark and adjacent thereto as may be desirable to be reserved and set apart for a public park for said city, and requires a report to the common council and also to the next legislature upon the assembling thereof.

*Pamph. L.* 1868, *p.* 206. An act for the establishment and govern-ment of the police of Jersey City, appoints three persons by name, board of police commissioners of Jersey City, in the county of Hudson, to serve until their successors are duly elected and qualified; makes the mayor and recorder of Jersey City *ex-officio* members of the board; provides that at the annual charter election in 1869 the qualified voters shall elect a commissioner to serve in the board for three years.

*Pamph. L.* 1868, *p.* 471. A supplement to an act to authorize the construction of works for supplying Jersey City and places adjacent with pure and wholesome water, approved March 25th, 1852, appoints by name four persons, together with the president of the board of aldermen, who shall be a member of the said board of water commis-sioners; it provides for the election at the annual charter election in the year 1869, and in every year thereafter, of one commissioner.

*Pamph. L.* 1868, *p.* 758. A supplement to an act to establish the Long Branch police sanitary and improvement commission, approved April 11th, 1867, appoints by name four persons to be the Long Branch commission, provides that they hold office for one year and until others are appointed in their stead. It further provides that it shall be lawful for the justice of the Supreme Court in whose judicial district the county of Monmouth is situate, upon the application of the applicants owning lands within the limits specified, annually to appoint one or more commissioners, not exceeding five in number, under the act.

*Pamph. L.* 1868, *p.* 805. An act to authorize the construction of works for supplying the city of Rahway and places adjacent with pure and wholesome water, appoints by name four persons and the mayor of the city for the time being as the first board; provides for the election at the charter election in 1869, and every year thereafter, of one commissioner in the place of one of those appointed.

*Pamph. L.* 1868, *p.* 834. A further supplement to an act entitled an act authorizing the appointment of commissioners to lay out and map streets, avenues and squares in that part of Bergen township, south of the Morris canal, in the county of Hudson, approved March 16th, 1857, appoints five persons by name a board of commissioners for the purposes defined, and provides that the powers of the com-missioners shall cease on May 1st, 1873.

*Pamph. L.* 1868, *p.* 1146. An act constituting a public road board for the laying out, constructing, appropriating, improving and main-taining public carriage roads in the county of Essex, appoints by name

three persons and their successors, and constitutes them a board of commissioners to be known as the Essex public road board, for the purpose of laying out and maintaining free carriage roads; provides that at the regular annual meeting of the chosen freeholders in the county in 1869, and every year thereafter, there shall be elected three commissioners.

*Pamph. L.* 1869, *p.* 830. An act to improve the Northfield road in the town of West Orange, Essex county, appoints by name three persons commissioners, to cause a portion of Northfield road to be macadamized in a thorough manner, and directs the township of West Orange to raise by taxes for the purposes of the act the sum of $6,000.

*Pamph. L.* 1869, *p.* 877. An act to authorize the extension of Glenwood avenue from Washington street, in East Orange, county of Essex, to the intersection of Paterson street, in the town of Orange, with a street called Essex street, appoints by name three persons commissioners, and invests them with all the rights, power and authority necessary and expedient to lay out, locate and open an avenue to be called Glenwood avenue. Provides that in case of vacancy, on the application of the remaining commissioners, any justice of the Supreme Court may fill the vacancy by appointment.

*Pamph. L.* 1869, *p.* 957. An act constituting a public road board for the laying out, constructing, appropriating, improving and maintaining public carriage roads in the county of Essex, appoints by name five persons, and constitutes them the Essex public road board, for the purpose of laying and straightening free carriage roads, in the county of Essex; provides for the subsequent appointment of one member of the board by the chosen freeholders, to hold office for one year, and that the remaining four members of the board shall be elected by the legal voters of the county for a term of two years each.

*Pamph. L.* 1869, *p.* 1080. An act to improve Paterson avenue from the westerly line of Paterson plank road to the Secaucus road, from Paterson avenue to Pen Horne's creek, in the county of Hudson; appoints by name a treasurer of the commission; appoints by name three persons as commissioners, and provides that vacancies shall be filled by the Court of Common Pleas.

*Pamph. L.* 1869, *p.* 1104. An act to widen and improve a road and avenue from Ridgeville to Englewood, in the township of Hackensack, Bergen county; appoints by name five persons commissioners, with full power to widen, straighten, grade, macadamize and put in order the public road mentioned. Limits the term of the commissioners to five years. Vacancies to be filled by the remaining commissioners.

*Pamph. L.* 1869, *p.* 1458. An act relating to the Jersey City drainage and water works, appoints by name four persons, together with the president of the board of aldermen of Jersey City, and constitutes them the board of water commissioners; provides for the election in 1869 and every year thereafter of one commissioner in place of one of the commissioners originally appointed, and fixes the term of the elective commissioners at four years.

*Pamph. L.* 1870, *p.* 127. An act to appoint commissioners to superintend the drainage of certain lands, lying in the township of Union, in the county of Union, appoints by name three persons commissioners for the purpose of employing one or more persons to dig and make all the water courses and drains necessary to effectually drain and carry off the water from the defined lands; confers upon the commissioners power to appoint their successors in office.

*Pamph. L.* 1870, *p.* 174. A further supplement to an act entitled an act to incorporate the city of Cape Island, approved February 28th, 1851, provides that in lieu of the five commissioners provided to be appointed by the mayor of the city of Cape Island under the original act, the justice of the Supreme Court presiding over the circuit of the county of Cape May shall appoint a board of commissioners, who shall continue in office for two years. Vacancies are to be filled by appointment to be made by such justice; power is conferred upon the board to borrow money, and the powers theretofore conferred upon the city council of Cape May in reference to the highways, streets, roads, lanes and alleys of the city, are by the act conferred upon the board of commissioners.

*Pamph. L.* 1870 *p.* 220. An act to improve certain roads or avenues in the township of Hackensack, in the county of Bergen, appoints by name five persons as commissioners with full authority to widen, straighten, grade and macadamize and put in good condition all that part of the road formerly known as the English neighborhood road; provides that the term of office of the commissioners shall expire at the end of three years; vacancies to be filled by the remaining commissioners.

*Pamph. L.* 1870, *p.* 334. An act for the establishment and government of the police of the city of Newark, constitutes four persons by name a board of police commissioners, together with the mayor of the city *ex-officio;* provides for the fixing of the term of each commissioner and for the election at the annual election in 1870, and thereafter annually, of one commissioner to take the place of one of the original commissioners.

*Pamph. L.* 1870, *p.* 369. An act to improve Kearney avenue in the townships of Kearney and Harrison, in the county of Hudson, appoints five commissioners by name to cause Kearney avenue to be graded; *provided,* there shall first be secured in writing, the consent of a majority of the owners having frontage.

*Pamph. L.* 1870, *p.* 505. An act concerning roads in the township of Hackensack, in the county of Bergen, appoints by name seven persons to constitute the public road board of the township of Hackensack, fixes the term of office at three years. Gives the board power to nominate to the township committee successors. In the event of failure of the township committee to appoint a successor, the commissioners are to call a meeting of the freeholders, who shall elect by ballot.

*Pamph. L.* 1870, *p.* 659. A further supplement to the act entitled an act to revise and amend the charter of the city of Newark, approved March 11th, 1857, appoints by name five persons, and constitutes them a board of commissioners with power to dig the land necessary to lay out, widen and extend a street called South street; makes it lawful for the mayor and common council of the city to issue bonds for the purposes of the act to an amount not exceeding $5,000.

*Pamph. L.* 1870, *p.* 737. An act to incorporate the Washington Fire Company, No. 1, of Matawan township, Monmouth county, creates the legal voters of the township of Matawan a body politic under the name of Washington Fire Company, No. 1, of Matawan township: appoints by name five persons to be trustees, and provides for the subsequent election of trustees by the legal voters.

*Pamph. L.* 1870, *p.* 879. An act to organize a board of sewerage for the city of New Brunswick, appoints four persons a board of commissioners of sewerage in and for the city of New Brunswick, whose term of office shall continue until others are elected by the legal

voters of the city, one of whom shall be elected in each succeeding year.

*Pamph. L.* 1870, *p.* 921. A further supplement to the act entitled an act to revise and amend the charter of the city of Newark, approved April 11th, 1857, provides for the establishment of a reform school in the city of Newark; appoints by name five persons, together with two members of the common council and the mayor *ex-officio,* the first board of trustees, and provides that at the next charter election and every year thereafter, two trustees shall be elected by the legal voters to take the place of the trustees appointed by the act.

*Pamph. L.* 1870, *p.* 1091. A further supplement to an act entitled an act to incorporate the city of Hoboken, approved March 28th, 1855, provides that the board of police commissioners shall consist of the mayor of the city and four persons appointed by the act by name; provides for the filling of vacancies by the mayor, with the consent of the common council.

*Pamph. L.* 1871, *p.* 795. An act appointing commissioners of streets and sewers in the city of New Brunswick, appoints by name three persons as commissioners of streets and sewers in the city of New Brunswick; provides for an election at the expiration of the terms of office of the said commissioners, respectively, of one commissioner annually by the legal voters, who shall hold office for five years; vacancies to be filled by the mayor, subject to confirmation.

*Pamph. L.* 1871, *p.* 1034. An act in relation to streets in Union township, in Union county, appoints by name five persons as the first commissioners; vacancies to be filled by the commissioners until the next charter election; provides for the election of one person as commissioner annually.

*Pamph. L.* 1871, *p.* 1094. An act to reorganize the government of Jersey City. This act names seven persons and constitutes them the board of public works; names five persons and constitutes them the board of police commissioners; names five persons and constitutes them the board of fire commissioners; provides that their successor shall be chosen by the senate and assembly in joint meeting, and that vacancies shall be filled by the governor; provides for the appointment of three police justices by the senate and general assembly in joint meeting; vacancies to be filled until joint meeting by the appointment of the governor.

*Pamph. L.* 1871, *p.* 1459. An act concerning roads in the township of Harrington, in the county of Bergen, appoints seven persons by name, the Harrington township road commission for a term of three years; gives each commissioner power to nominate for approval by a majority of the freeholders at their April meeting, his successor. In the event of the failure of the meeting to approve he shall make a second recommendation, and in the event that this recommendation is not approved, a special meeting of the freeholders shall be held.

*Pamph. L.* 1871, *p.* 1485. A supplement to an act entitled an act to authorize the construction of works for supplying the city of Rahway and places adjacent, with pure and wholesome water, approved April 7th, 1868, appoints by name three persons, in addition to the *ex-officio* members, the mayor and chairman of the committee on fire department of common council, as the first board of water commissioners; provides for the election in 1872 and each year thereafter of one commissioner to take the place of one of the commissioners appointed by the act.

*Pamph. L.* 1871, *p.* 1515. An act concerning roads in the township of Lebanon, in the county of Hunterdon, appoints by name five per-

sons to be the first commissioners of roads and provides that annually after the expiration of the term of the commissioner the legal voters of the townships shall elect one person as commissioner at the annual town meeting and that vacancies in the board may be filled by the remaining members of the board until the next town meeting.

*Pamph. L.* 1872, *p.* 218. An act to authorize the appointment of commissioners to lay out streets, avenues and public squares in the township of Clinton, in the county of Essex, and for other purposes, appoints by name five persons to be commissioners of streets and avenues, and in the event of vacancy permission of remaining commissioners to name a suitable person; successors of the commissioners named in the act are to be appointed by the town committee for a term of one year.

*Pamph. L.* 1872, *p.* 365. An act to widen, grade and improve Ridge road, in the township of Union, in the county of Bergen. The act appoints five persons by name commissioners to widen, grade and improve the road, provided that the said commissioners shall obtain the consent in writing of a majority of the owners having frontage on said road; fixes the term of office at three years; vacancies in the board to be filled by the remaining commissioners at a meeting called for that purpose.

*Pamph. L.* 1872, *p.* 797. An act to authorize the extension of New street from Maple avenue, in the township of East Orange, in the county of Essex, to Munn avenue, in said township, appoints by name three persons commissioners to survey, lay out, locate and open the said street; provides that vacancies shall be filled by one of the justices of the Supreme Court.

*Pamph. L.* 1872, *p.* 976. An act respecting the lines of wharves, docks, slips and piers on the Passaic river, in the counties of Essex and Hudson, appoints by name six persons commissioners to fix, establish and determine permanent and proper lines for the erection of wharves where the same have not already been fixed by the board of chosen freeholders of Essex and Hudson counties; provides that the costs and charges shall be paid in equal proportions by the board of chosen freeholders of said counties; authorizes the directors of the board of chosen freeholders respectively to fill any vacancies which may occur among the commissioners from their said county.

*Pamph. L.* 1872, *p.* 1368. An act to authorize the appointment of commissioners to lay out streets and avenues in certain lands in the township of Bloomfield, in the county of Essex, and for other purposes, appoints five persons by name commissioners of streets and avenues in the township of Bloomfield and in the event of vacancies confers upon the remaining commissioners power to appoint a suitable person or persons to fill such vacancy; the successors of the original commissioners at the expiration of their terms to be appointed by the town committee of the township for the term of one year.

*Pamph. L.* 1872, *p.* 1379. An act to improve Bull Ferry road in Hudson county, appoints by name three persons commissioners; provides that in case of vacancy it shall be filled by the judge of the Circuit Court of the county of Hudson.

*Pamph. L.* 1872, *p.* 1386. An act to improve Bergen line road in Hudson county, vests the power to regulate, widen and straighten Bergen line road, in three commissioners to be appointed by a justice of the Supreme Court of the sixth district. Vacancies are to be filled by the remaining commissioners at a meeting called for that purpose.

*Pamph. L.* 1873, *p.* 697. An act to provide for opening, constructing and maintaining an avenue or road in the county of Hudson,

appoints by name nine persons and their successors as a board of commissioners for the purpose of laying out an avenue in the county of Hudson.

*Pamph. L.* 1873, *p.* 799. An act providing for the construction of a main sewer in the city of Hoboken and township of Weehawken, appoints three persons by name commissioners for the purpose of the act.

*Pamph. L.* 1874, *p.* 436. An act to authorize the construction of works for the purpose of supplying the city of Plainfield with pure and wholesome water. The act appoints four persons and the mayor of the city for the time being the first board of water commissioners.

If, in view of the course of legislation referred to, any doubt could be deemed to exist as to the power of the legislature to provide for the government of local affairs by commission or otherwise, without regard to the privilege of local self-government, we are clear that it must be taken as wholly set at rest by the action of the people themselves in adopting the constitutional amendments of 1875; one of the most important and conspicuous of which was the insertion in section 7, article 4, of a new paragraph, the pertinent portions of which are as follows:

"The legislature shall not pass private, local or special laws in any of the following enumerated cases, that is to say:

"Laying out, opening, altering and working roads or highways.

"Vacating any road, town plot, street, alley or public grounds.

"Regulating the internal affairs of towns and counties; appointing local offices or commissions to regulate municipal affairs.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"The legislature shall pass general laws providing for the cases enumerated in this paragraph, and for all other cases which, in its judgment, may be provided for by general laws."

This amendment was adopted in full view of, and, in part, because of the practice so long pursued by the legislature of passing *special* laws providing for local government. What the people prohibited was *the passage of private, local or special laws in these cases,* as well as in the other cases enumerated. *But this prohibition was accompanied with the*

*express authorization, if not mandate, to pass general laws providing for such cases.* There is here clear authority in the letter of the constitution, as amended, for the legislature to pass *general* laws providing for the appointment of commissions to regulate municipal affairs.

Nor are the pamphlet laws since the constitutional amendments of 1875 devoid of legislation establishing, by general acts, what may be called "government by commission" as distinguished from local self-government.

In *Pamph. L.* 1895, *p.* 169 (*Gen. Stat., p.* 2618), the legislature enacted what is known as the Park Commission act, providing for a park commission to be appointed by the justice of the Supreme Court presiding in the courts of a county, and for appointments to fill vacancies to be made by the same justice, and giving to the commissioners considerable powers of local government, including the undertaking of large improvements and the assessment of benefits to arise therefrom upon property benefited (this, of course, is an exercise of the power of taxation—5 *Vroom* 227; 6 *Id.* 168; 8 *Id.* 415), and authorizing the commissioners (by section 14) to make requisition upon the board of chosen freeholders of the county for moneys to meet the expenses of the park commission over and above the proceeds of benefit assessments, and requiring the board of freeholders to borrow money upon the credit of the county by issuing bonds and providing a sinking fund to be met from the proceeds of taxation. It is true the act provides that it shall not take effect in any county until its adoption by a majority vote of the people. But, as already pointed out, it cannot be that the principle of local self-government permits that the voters by a single election shall take from themselves and those who are to come after them the control over their affairs during succeeding generations. The Park Commission act has come before this court in repeated cases (*Freeholders of Essex* v. *Park Commission,* 33 *Vroom* 376, where a *mandamus* upon the board of freeholders was sanctioned; *Ross* v. *Freeholders of Essex,* 40 *Id.* 291), where this court held it constitutional to confer upon a justice of the Supreme Court the power of appointing commis-

sioners. The latter case was most elaborately argued, and it is worthy of note that it did not occur either to counsel or to the court that the non-participation by the people in the choice of the commissioners constituted an obstacle to the act.

In *Pamph. L.* 1896, *p.* 339, "An act relating to boroughs and borough commissions," the legislature repealed certain prior borough acts, and declared that every *de facto* corporation theretofore established under any of these acts and exercising corporate powers should be created a borough by its then present corporate name, and should be governed by certain general laws of the state relating to boroughs, and that the presiding officer and members of the governing body should be the mayor and councilmen of the borough hereby created, and should continue in office until the next succeeding annual borough election. This act was sustained as constitutional by the Supreme Court in *Kennedy* v. *Belmar,* 32 *Vroom* 20.

In *Pamph. L.* 1899, *p.* 534, "An act relating to certain illegal borough governments, requiring the payment of their debts," the legislature declared that every attempted organization by the inhabitants of any portion of the territory of the state of a borough or borough commission under the provisions of any act since declared unconstitutional or repealed, and which attempted borough organization incurred debts which have not been paid, and which attempted borough organization is not now a *de facto* or *de jure* government, is hereby created a borough by its former name, and as such shall be a body corporate and responsible for all contracts, debts, &c., of the attempted borough organization; that the last presiding officer and members of the last governing body and the last clerk residing within the borough limits should be the mayor and councilmen and borough clerk of the borough, to continue in office until the next election, and the said mayor and councilmen should by appointment fill all other offices required by the provisions of the general borough laws until the next annual borough election. Here the legislature, in effect, for the purpose of creating and enforcing a public obligation out of what was at the most a mere

moral obligation, created boroughs where there existed none, either *de facto* or *de jure;* in effect appointed the mayor, councilmen and borough clerk by designating those who had last served in those capacities, to continue in office until the next election, and conferred upon the boroughs thus created whatever powers were requisite to enforce the payment of their debts. In *Cooper* v. *Springer,* 36 *Vroom* 594, this court sustained the constitutionality of that act, but only to the extent necessary to require the payment of the debts of the illegal boroughs, holding that this was a limitation of the object of the act as expressed in the title.

The decision of the Supreme Court in *Gilhooly* v. *Elizabeth,* 37 *Vroom* 484, is not to the contrary. There the law that was under consideration was held to be a special law, and this, combined with the fact that it regulated municipal affairs by commission, was held to render it unconstitutional.

The decision of this court in *Township of Bernards* v. *Allen,* 32 *Vroom* 228, turned upon the delegation by the legislature of the legislative function of taxation to ministerial officers or to another department of the government, and is not an apt precedent upon the question now before us. The same is true of *Van Cleve* v. *Passaic Valley Sewerage Commissioners,* 42 *Id.* 574.

The conclusion reached by the foregoing views, which were formulated by Chancellor Pitney, is that the first of the two questions propounded by the court for argument should be answered in the affirmative.

2. Even if it should be deemed that it has not been conclusively demonstrated that the privilege of "home rule" does not inhere in the form of government established under our constitution as a constitutional limitation upon legislative action, our practical response to the first question would be the same, for, if the existence of such a limitation be at all doubtful, the action of the legislative branch of the government will not be declared invalid by the judicial branch. This doctrine, which is now a firmly established rule of judicial policy, arose almost simultaneously with the assumption by the courts of this country of the power to declare void a legislative act that

violated a constitutional limitation, and was, indeed, one of the safeguards of that unique power that facilitated its final assumption by the courts.

Immediate assent, however, was not accorded to the new power that was for the first time asserted—not as is sometimes stated in 1786 by the Supreme Court of Rhode Island in the case of Grevett v. Weeden, nor by the Virginia court in Commonwealth v. Caton in 1782—but by the Supreme Court of New Jersey in 1780 in the case of Holmes v. Walton, an unreported case, cited by Judge Kirkpatrick in State v. Parkhurst, 4 Halst. 427, 444, and said by Mr. Dillon (Dill. Jur. 200), and by Professor Thayer (1 Const. L. 62, note), to be the first decided case holding it to be the constitutional duty of the court to declare void an unconstitutional statute; the exact date of the New Jersey decision having been determined by Dr. Scott of Rutgers College. 2 Am. Hist. Asso. papers, 1886.

As late as 1825, Mr. Justice Gibson, afterwards Pennsylvania's ablest Chief Justice, in a vigorous dissenting opinion, denied such power in toto saving under a constitution that expressly conferred it. Eakin v. Raub, 12 S. & R. 330.

"I have changed that opinion," the Chief Justice is reported to have said to counsel in 1845. Norris v. Clymer, 2 Pa. St. 281.

Marbury v. Madison, 1 Cranch 138, was decided in 1803, but its reasoning was not in all respects applicable to state courts.

As early, however, as 1811, Chief Justice Tilghman, of Pennsylvania, spoke of the doctrine as not only already established, but also as having a well-defined limitation. "For weighty considerations," he said, "it has been assumed as a principle in constitutional construction by the Supreme Court of the United States, by this court and every other court of reputation in the United States that an act of the legislature is not to be declared void unless the violation of the constitution is so manifest as to leave no room for reasonable doubt." Commonwealth v. Smith, 4 Binn. 117.

The year following, viz., 1812, Chancellor Waties, of South

Carolina, than whom no judge had more strenuously insisted upon the power of the courts to disregard unconstitutional legislative acts, said: "The validity of a law ought not to be questioned unless it is so obviously repugnant to the constitution that when pointed out by the judges all men of sense and reflection in the community may perceive the repugnancy." *Byrne* v. *Stewart,* 3 *Des.* 466.

In *Ogden* v. *Saunders,* 12 *Wheat.* 213, Mr. Justice Washington said that to doubt the invalidity of an act was to sustain it, since its validity must be presumed, "until its violation of the constitution is proved beyond all reasonable doubt," adding that he knew that this "expresses the honest sentiments of each and every member of this bench." Chief Justice Waite, in the *Sinking Fund Cases,* 99 *U. S.* 700, says that this presumption "continues until the contrary is shown beyond a rational doubt."

In Massachusetts, Chief Justice Shaw (*In re Wellington,* 16 *Pick.* 87), stated the rule to be "never to declare a statute void unless the nullity and invalidity of the act are placed in their (the judges') judgment beyond reasonable doubt."

In the *Dartmouth College Case,* 4 *Wheat.* 518, Chief Justice Marshall said of the United States Supreme Court "that in no doubtful case would it pronounce a legislative act to be contrary to the constitution."

These citations, which might be indefinitely extended, show the existence of a well-defined though self-imposed limitation of the judicial function of declaring legislative acts to be void for unconstitutionality, which limitation is for practical purposes stated to be that an act will not be declared void by the courts if its unconstitutionality is in anywise doubtful.

The principle underlying this rule will, upon reflection and an examination of its history, be found to inhere in the essentially judicial character of the power the courts have thus assumed. There can indeed be no greater mistake than that of regarding the power exercised by state courts in declaring legislative enactments unconstitutional as something different from and merely engrafted upon their purely judicial functions. For such mistaken conception leads to the radical error

that, if duly challenged, a legislative act will be sustained only when it is demonstrably constitutional. Such a notion in effect supplements the constitution by requiring the affirmative concurrence of all three departments of the government where that instrument of the organic law requires but two, viz., the legislative and the executive, and thus in effect annexes to the judicial branch a *quasi*-legislative function akin to that which the constitution itself has annexed to the executive by the veto power. That no such direct participation of the judicial department in what is essentially an incident of the law-making power, viz., the observance of constitutional limitations, was contemplated by the framers of the constitution is conclusively shown by the fact that no such provision was made by the constitution. If such participation, which amounts to a control equal in efficiency to the veto power conferred upon the executive, had been intended to be conferred upon the judiciary, it is incredible that a provision of such magnitude would not have received a like mention. As a matter of common knowledge in ninety-nine cases out of a hundred or even in a larger proportion the laws enacted by the legislature derive their entire validity as constitutional enactments solely from the source where the constitution itself has placed the determination of constitutional observance as an incident of the law-making power, viz., with the legislative and executive departments. No way is provided by the constitution, or even remotely suggested, by which the validity of such determinations may be either anticipated or postponed or held in abeyance until the result of a judicial participation can be heard from. In the vast majority of cases the judicial judgment is never invoked. What actually takes place is, that if in the course of litigation between parties it happens that the issue is affected by a legislative act, the courts decide the question thus arising upon judicial principles as an incident of litigation and not upon *quasi*-legislative principles as an incident of the law-making or vetoing power. The difference in principle is fundamental and the practical distinction as clear and of the same nature as that which is applied every day in the review of verdicts, where the question is not whether the court finds

that a given state of facts is as the jury found it, but whether it finds that such given state of facts could not be legitimately found by the jury. The error of which we are speaking is reflected in the common expression that an act of the legislature is set aside by the courts, whereas the truth is that courts never set aside acts of the legislature in the sense that they set aside municipal ordinances or public grants on direct attack. What the courts do is to declare in the course of a specific litigation that the rights of a party thereto are not affected by a certain statute for the reason of its non-conformity to the paramount law. *Allison* v. *Corker,* 38 *Vroom* 596.

The judicial function therefore with respect to the invalidation of a legislative act does not consist merely in comparing the determination evinced by such act with that reached by the court and the substitution of the latter for the former whenever they happen to differ. On the contrary, the ultimate judicial question is not whether the court construes the constitution as permitting the act, but whether the constitution permits the court to disregard the act; a question that is not to be conclusively tested by the court's judgment as to the constitutionality of the act, but by its conclusion as to what judgment was permissible to that department of the government to which the constitution has committed the duty of making such judgment.

A court by force of its own reasoning, or by reason of the diversity of sentiment among its own members, may often conclude that, while according to what it deems the correct view, an act is void, still there is another view that is permissible that would support the act. As legislators the judges would be bound to follow their own judgment, but as a court they must accord that same right to those in whom the constitution has reposed it.

Hence, as was pointed out by Judge Cooley (*Const. L.* (6*th ed.*) 68), there is no inconsistence in a man's voting as legislator against a measure as being, in his judgment, unconstitutional, and afterwards, when placed upon the bench, declaring it constitutional, notwithstanding that his own

opinion had undergone no change; an illustration that is cited with approval by Mr. Bryce in his *American Common-wealth* (*Vol.* 1, *p.* 431), and by ·Professor Thayer (*Leg. Es.* 22).

If such be the established rule and policy when a permissible doubt exists as to the proper interpretation or construction of the written language of a constitution, with how much greater force must they of necessity apply to such doubts as arise when the existence of a constitutional limitation or restriction is sought to be established and defined, not by reference to any words that are written in that instrument, but by reference to the ·spirit that is supposed to pervade it or to underlie or to overshadow the purposes and provisions expressed in its written language. During the period when the power of the judiciary to declare an act of the legislature unconstitutional was still under discussion, one of the arguments advanced in support of such power was that it was merely the construction of a writing which was always a court·question. As an argument this was inadequate and is not the foundation of the doctrine that was subsequently established, but in its bearing upon the rule that is to control in cases of doubt it is fruitful of pertinent suggestions. When the written language of a constitution is laid before a court for construction the ultimate object of inquiry is fixed and uniform; it is the same for all and is equally available to every judge. Moreover, the rules to be applied are in the main fixed canons of construction about which, more than perhaps in any other department of the law, there is substantial unanimity. Hence both the exact language to be construed and the precise instruments to be employed in its construction are before every member of the court alike, so that all uncertainty and diversities of view from that source are practically eliminated. If, therefore, under circumstances like these, the rule has arisen that if there be a permissible doubt whether an act of the legislature transgresses the constitution the court will not declare it invalid, with what added force must such rule apply, when, with no determinate matter before them and with no established rules or uniform

sources of information for their guidance, judges are asked to declare an act invalid because of an inference that may be drawn from certain data gathered from sources historical, literary or political, *aliunde* the constitution, in support of the argument that such act is at variance with the spirit that animated the framers of the constitution and hence must be judicially declared to pervade that instrument and to be perpetuated by it although unexpressed in its provisions. Such a proposition must inevitably present some, if not many, questions as to which permissible doubts may arise. In the collection of data, for instance, what books or documents are the judges to consult and on which are they to rely? Is their research to be uniform and along similar lines or is each judge to reach his conclusion from sources of information selected by or available to him? What credit is to be given where authors differ? And if out of this uncertainty it be determined as an historical fact that the governmental policy of "home rule," for instance, prevailed and was a conspicuous fact in the minds of the framers of the constitution, by what line of reasoning, that is beyond a permissible doubt, can it be said in the same breath that it was left out of the constitution and yet was perpetuated by it?

If a written instrument framed to declare the rights of parties omit a matter that was present to the minds of each, the fact that such matter was not put in writing is conclusive of the intention of the framers of the instrument to leave it out. Can it be said, therefore, that when the framers of an instrument that was to declare the rights of all of the people left out of its provisions an important matter of governmental policy that was conspicuously present in their minds and required but a sentence to transform it into a constitutional privilege, they thought that they were not only perpetuating such policy, but were transforming it into a privilege by which the expressed provisions of the constitution were to be limited and restricted? And if such a canon of construction could appeal persuasively to any judicial mind, can it be said that it admits of no permissible doubt?

I am not suggesting that an investigation conducted along

these lines is so essentially unjudicial in character as to put the whole matter out of court; what I am pointing out is that, in a case like the present, where, when asked to say that the legislature has passed an act that the constitution forbids, we are directed not to something that was put in the constitution by its framers but to something that was left out of it by them, the doubt that must inevitably exist as to the conclusive correctness of any such inference drawn from extra-constitutional sources is sufficient to determine our judicial action under the rule stated by Marshall that "in no doubtful case would a court pronounce a legislative act to be contrary to the constitution."

This rule is sometimes stated by text-writers to rest upon the doctrine of contemporaneous construction, but for the reasons already given we think that its true foundation is in the judicial character of the function that is being exercised rather than in a mere rule of expediency or doctrine of repose. A host of decisions illustrating this rule will be found in the *Century Digest* under the head of Constitutional Law, "Presumptions and construction in favor of constitutionality," volume 10, section 46, and under the syllabus "Courts may not declare an act void merely because in their opinion it is opposed to the spirit supposed to pervade the constitution," same volume and title, section 38.

These illustrations of the law furnish the best answer to the brilliant but unconvincing argument of Judge Cooley in his concurring opinion in *People* v. *Hurlburt, 24 Mich.* 44, which contrasts so sharply with his exegesis of the same subject when as a text-writer he says: "If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the minds of the judges to violate fundamental principles of republican government, *unless it shall be found that those principles are placed beyond legislative encroachment by the constitution.*" *Cooley Const. Lim.* (*5th ed.*) 202.

It has, I think, been made evident by the foregoing considerations that there are three views that may be taken with respect to the existence of a constitutional limitation by force

of which the legislature is prohibited from creating and providing for the appointment of a commission to function in the regulation of municipal affairs unless the members of such commission are selected by the electors of such municipality.

The first view is that no such limitation exists, either as a provision of the constitution or as a spirit pervading that instrument.

The second is that the right to create such a commission, if not expressly enjoined, is impliedly conferred upon the legislature by the amended constitution.

The third is that if either of the former views be tenable or even permissible the contrary view is by that circumstance alone rendered doubtful within the meaning of Chief Justice Marshall's rule that "in no doubtful case will a court pronounce a legislative act to be contrary to the constitution."

Practically, therefore, these views all converge to a common end that results in our refusal to declare that the Civil Service act of 1908 is unconstitutional in the respects urged against its validity upon this branch of the present case.

This, for the purposes of the case in hand, disposes of the constitutional question raised by the first query put to counsel by the court, and results in our sustaining the act in question in so far as this ground of attack upon its constitutionality is concerned.

II. The second question upon which the views of counsel were requested is this: Assuming that the legislature has authority to create a commission so composed, and clothed with such powers, can it delegate to the governing body of such municipality, instead of to the voters thereof, the determination of the question whether the powers conferred upon the commission shall be exercised by it in the municipality?

This question raises the constitutionality of the provision contained in the thirtieth section of the Civil Service act, by which such act is made to take effect in any municipality when adopted by the governing body thereof.

Section 30 is as follows:

"30. Any municipality of this state may adopt the provisions of this act by an ordinance, duly adopted by the governing body of such municipality or by the petition and vote of the qualified voters of such municipality as hereinafter provided."

Section 31 provides the method of taking such popular vote and declares how the adoption of the act shall be certified to the civil service commission but makes no provision as to the effect of its failure of adoption, i. e., no affirmative power of rejection is given. The act therefore may be adopted by the governing body without submitting the question to popular vote or the act may, upon proper procedure, be so submitted, and, if it fail of adoption by the electors, be then adopted by the governing body; in other words, the failure of either one of these two designated bodies to adopt the act does not prevent its adoption by the other. This is not a double referendum, such as was upheld by this court in *Noonan* v. *Hudson County*, 23 *Vroom* 398, but an alternative referendum, to which such decision has no application. The difference is manifest. A double referendum, by providing for a popular election after the affirmative action upon the same matter of the governing body, requires the concurrent affirmation of both bodies, that of the voters being a *sine qua non* to the adoption of the act. The alternative referendum, on the contrary, by providing for the adoption of the act either by the governing body or by the voters, not only requires no concurrent affirmation to which the popular voice is essential, but permits the adoption of the act by the action of the governing body, notwithstanding that it had failed of adoption by the people at the polls. This feature alone would seem to stultify the referendum provision of the act, for the reason that the sole argument and justification for the submission of the adoption of a statute to the governing body of a municipality is the presumption of the representative character of such body in this respect; when, therefore, such governing body is invested with power to adopt a statute, after it has failed of adoption by the people, such governing body is, in effect, clothed with authority to adopt the new law notwithstanding

that it demonstrably appears that it is not in this regard representative of the will of the people whose local government is to be so changed. For such a mode of changing local governments it is not perceived that there can be either justification or argument. This phase of the subject need not, however, be further pursued for the reason that the question propounded to counsel and considered by the court goes directly to the fundamental question as to the constitutionality of a statute that is enacted to take effect upon its adoption by the governing body of the municipality to be affected by it.

It is evident, at the outset, that this question is part of a larger question, viz., whether a legislative enactment that takes effect, not at the will of the legislature, but at the will of somebody else, is a constitutionally enacted law?

This question, in so far as the submission of the adoption of charters or their supplements to popular vote is concerned, is entirely at rest in this state. The leading case upon this subject, and the earliest in point of time, is *Paterson* v. *The Society,* 4 *Zab.* 385, decided in the Supreme Court in 1854, upon an opinion delivered by Chief Justice Henry W. Green, in which the subject is treated with characteristic comprehensiveness.

The question before the court was whether or not the act incorporating the township of Paterson into the city of Paterson, which contained a provision that it should not go into effect unless the consent of a majority of the electors of the township should be first obtained, was a constitutional act of legislation.

The constitutional question as stated in the opinion was "Whether a statute is rendered unconstitutional by the fact that its operation is made to depend upon the will of the people expressed through the ballot-box?"

In dealing with this question three propositions of constitutional law were "conceded as indisputable." They were—*first,* that legislation cannot be exercised directly by the people; *second,* that the legislative power can be exercised only in the mode prescribed by the constitution; *third,* that a law enacted in any other mode is void.

Having laid down these fundamental propositions Chief Justice Green proceeds to show that the legislature, in submitting the charter provisions of a municipal corporation to the would-be corporators, violates none of these fundamental propositions, for the reason that neither the propriety of the provisions themselves as proper municipal regulations nor the expediency of granting or tendering a charter containing these provisions to the township of Paterson, which were the only legislative questions involved, was submitted to the people; nor for that matter was the question of acceptance at all submitted to the people in their sovereign capacity, *i. e.,* as lawmakers, but solely as a designated class of the community, viz., those persons who, in the operation of the proposed corporation would be directly affected by its provisions.

"The question submitted by the act to the inhabitants of the district," he says, "was submitted to them not as a part of the sovereign people but simply as corporators. * * * Their vote was an act of acceptance not of legislation."

Upon the ground thus stated, viz., that the acceptance of the statute was not an act of lawmaking or the action of lawmakers or of a lawmaking body, the constitutionality of the act was rested and sustained.

The opinion of Chief Justice Green in Paterson *v.* The Society has been over and over again cited in the Supreme Court and in this court with uniform and unqualified approval, and, what is more to the point, has been followed in a long line of cases in which statutes thus affecting local government have been enacted to take effect upon their acceptance by the electors of the district immediately affected.

In the list of these cases that follows I shall cite first those cases in which, as in the leading case, the statute was a complete legislative enactment requiring only acceptance to incorporate its provisions in the scheme of local government, and afterward shall cite cases in which the statute delegated legislative powers to be exercised (or not) by the local government, a distinction that, because it inheres in the statutes themselves, and is essential to the harmony of our decisions, should be recognized. For convenience this distinction may

be expressed by the terms "referendum statutes" and "statutes delegating legislative power."

The referendum cases are: *Warner* v. *Hoagland, 22 Vroom* 63; *In re Cleveland, Id.* 319; *S. C. on error,* 23 *Id.* 188; *Kennedy* v. *Belmar, 32 Id.* 20; *Allison* v. *Corker, 38 Id.* 596.

The cases involving the delegation of legislative power are: *Sandford* v. *Morris Pleas,* 7 *Vroom* 72; *Paul* v. *Gloucester County,* 21 *Id.* 585; *Noonan* v. *Hudson County,* 22 *Id.* 454; *S. C. on error,* 23 *Id.* 398.

These cases are conclusive of what we have called the larger question, viz., the validity of enactments depending for their operation upon some other will than that of the legislature. They go further and establish the validity of such statutes when such other will is that of the voters expressed at the polls, and they have also a direct bearing upon the question that is now before us for determination, viz., whether a statute, that would unquestionably be valid if its acceptance was submitted to the voters of a municipality, is equally so if the submission be to the governing body of such municipality.

Examining the state of our judicial decisions upon this last question I have been able to find but three cases in which such a submission, *i. e.,* to the governing body, was considered and sustained as valid. These three cases are: *Riley* v. *Trenton, 22 Vroom* 498; *De Hart* v. *Atlantic City (Supreme Court),* 33 *Id.* 586; *Schwarz* v. *Dover,* 41 *Id.* 502; 43 *Id.* 311.

Before discussing these cases reference should be made to some cases in which, although the statute was of the same nature as that in the Trenton and Dover cases, no decision was reached upon the point now under consideration.

In *Sanford* v. *Morris Pleas,* 7 *Vroom* 72; *Paul* v. *Gloucester County,* 21 *Id.* 585, and *Noonan* v. *Hudson County,* 22 *Id.* 454, the ultimate submission was to the popular vote.

In *Dexheimer* v. *Orange,* 31 *Vroom* 111, the statute was held invalid.

In *Rutten* v. *Paterson,* 44 *Vroom* 467, the required action of the board of freeholders that, if taken, would have raised

the point, was not taken, hence the proceedings were set aside, the opinion holding, incidentally, that the statute was "not unconstitutional as delegating legislative power to *private* citizens."

Returning to the discussion of the three cases in which the point was raised and decided, viz., Riley *v.* Trenton, DeHart *v.* Atlantic City and Schwarz *v.* Dover, it will be seen that DeHart *v.* Atlantic City was the only one. in which a statute that was in effect a supplement to a municipal charter was limited to, and made operative in, those municipalities alone whose governing body should adopt such statute, *i. e.,* a "referendum statute."

In the other two cases the statute was not of such a character or so limited or conditioned but was *ex vi termini* an accession to the law-making power of an entire class of municipalities, *i. e.,* a "statute delegating legislative power." It happens that in each case the power so delegated was that of creating boards of excise.

The distinction, therefore, between the statute that was considered in DeHart *v.* Atlantic City and those considered in the Trenton and Dover cases is that the latter conferred legislative power upon all municipalities of a certain class, to be, like all legislative power, exercised by the governing bodies of such municipalities; whereas the former conferred no power at all except upon those municipalities that adopted the act. This distinction is not only as we have said inherent in the statutes themselves, but its recognition is essential in the constitutional aspect upon which Paterson *v.* The Society was decided. For if the acceptance of a statute is not an act of legislation, and cannot be submitted as an act of lawmaking even to the people themselves, it follows *a fortiori* that it cannot be submitted to the lawmaking body of such people, *i. e.,* their governing body. The distinction is also essential to the logical validity of the decision in the Trenton and Dover cases, for if the acts considered in these cases had been "referendum statutes" they would have required *acceptance* and not merely the *exercise* of legislative power by the local governing body. Our cases therefore, with the single exception of De-

Hart *v.* Atlantic City, are all harmonized by the recognition of the fact that from a constitutional standpoint the *acceptance* by a municipal corporation of the provisions of a legislative act is one thing and that the delegation of *legislative* power to municipal corporations is quite another and different thing.

Of the former, *i. e.,* "referendum statutes," Paterson *v.* The Society is the leading example; of the latter, *i. e.,* "statutes delegating powers of local government," the most conspicuous illustration is Paul *v.* Gloucester County, in which Mr. Justice Van Syckel said: "The validity of this law may be rested securely upon the right of the legislature to delegate the powers of local government to political subdivisions of the state."

In this opinion of Mr. Justice Van Syckel Justices Depue and Dixon concurred. It is therefore a most significant fact that when at the very next term after the decision of Paul *v.* Gloucester County these same three justices, sitting in the Supreme Court, decided the case of Warner *v.* Hoagland, in which the statute was a referendum act, the submission of the statute to popular vote was explicitly vindicated in Mr. Justice Depue's opinion upon the ground that "A provision in a municipal charter or in a supplement to it, that it should not take effect unless accepted by the inhabitants is *not a delegation of legislative power,"* the exact antithesis of the ground of decision in Paul *v.* Gloucester County.

And throughout his opinion Mr. Justice Depue adopts the doctrine and almost the precise words of Chief Justice Green in Paterson *v.* The Society, saying in conclusion: "The acceptance is submitted to the inhabitants of the municipalities as corporators, and not as a sovereign part of the people, and their vote is an act of acceptance and not of legislation."

The case now before us for decision is like Warner *v.* Hoagland and Paterson *v.* The Society in that the legislation involved is a referendum statute and not a delegation of legislative power; and a review of the cases in which such statutes were involved, from the time Paterson *v.* The Society was decided down to the present time, reveals no case in which

the submission of such a statute, otherwise than to the voters, has been sustained, with the single exception of DeHart *v.* Atlantic City in the Supreme Court.

This one Supreme Court decision is therefore the only authority for the right of the legislature to submit the acceptance of such a statute to the governing body of a municipality. It is true that this case came to this court on error, and that the judgment was reversed, but not upon the point now under consideration, touching which the only reference in the opinion of Chancellor McGill is the query: "If the adoption of the act may be by a city council why not by a single city official?" *DeHart* v. *Atlantic City*, 34 *Vroom* 223.

This Supreme Court decision, however, runs directly counter to the fundamental doctrine of Paterson *v.* The Society, which may be summarized to be that the legislative will may be imposed as law upon municipalities, but, if any other will is to intervene between the legislature and such municipalities, it must be the will of the people who are to be governed by such law and not an alien will, even though it be that of the governing body for the time being of the municipality. That this is the logical result of the doctrine that we have adopted has been sufficiently pointed out, and it must be equally clear that such doctrine is effectually subverted, if some other will than that either of the legislature or of the people can be called in to eke out the constitutional enactment of a law.

Paterson *v.* The Society called for the application of this doctrine only to the extent that a municipal charter enacted to take effect upon its acceptance by the electors of the municipality was a constitutionally enacted law; the case now before us calls for the application of the same doctrine to the extent that a supplemental municipal charter enacted to take effect on its adoption by the law-making body of the municipality is not a constitutionally enacted law.

No case calling for this application of the doctrine of Paterson *v.* The Society has hitherto come to this court, with the exception of DeHart *v.* Atlantic City, in which the point was not considered, or, at least, was not decided.

In the decision of the present case, therefore, I am of opinion that the decision of this point in DeHart *v.* Atlantic City, in the Supreme Court, should be overruled, and the true doctrine applicable to the case before us declared to be as herein stated. From this it results that a statute in the nature of a supplemental charter that is enacted to take effect upon its adoption by the governing body of a municipality is not a constitutionally enacted law.

This result leads in the present case, not to the invalidation of the Civil Service law, as a whole, but merely to the excision of those provisions that are conditioned upon the adoption of the act by municipalities.

The two classes of provisions are independent and clearly severable under the rule stated in *Attorney-General* v. *Anglesea,* 29 *Vroom* 372. The statute itself, in its thirty-third section, expressly provides that "in case for any reason any section or any provision of this act shall be questioned in any court and held to be unconstitutional or invalid, the same shall not be held to affect any other section or provision of this act."

With the force and effect of this section and also with the severability, by judicial rule, of the two methods contained in the act for its adoption by municipalities, we are not called upon to deal or to express any opinion. The statute in the present instance having been adopted by the governing body and being on that account held to be invalid as a protection to the plaintiff in error, further questions that might arise on some other state of facts are of no concern to him.

The construction placed upon the act by Mr. Justice Swayze in the Supreme Court, in so far as the office in dispute is concerned, meets with our approval, but with regard to the views suggested as to the office of Vice Chancellor in *McKenzie* v. *Elliott,* 48 *Vroom* 43, we wish to be understood as expressing no opinion.

In accordance with the foregoing views, the judgment of the Supreme Court is affirmed.

At the request of three members of the court, the votes upon the following questions were taken separately:

1. Is the act of April 10th, 1908, unconstitutional in so far as it provides that in municipalities that adopt the act the appointment of certain officers and employes shall be regulated in part by a commission, the members of which are not appointed by or from among the electors or inhabitants of such municipalities respectively?

*Yes*—None.

*No*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, REED, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VROOM, GRAY, DILL, CONGDON, JJ.  14.

2. Is the act unconstitutional in so far as it is made to take effect in municipalities upon its adoption by the governing body thereof?

*Yes*—THE CHIEF JUSTICE, GARRISON, REED, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VROOM, GRAY, DILL, CONGDON, JJ.  13.

*No*—THE CHANCELLOR.  1.

3. Shall the judgment of the Supreme Court be affirmed?

*Yes*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, REED, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VROOM, GRAY, DILL, CONGDON, JJ.  14.

*No*—None.