60 N.J. Super. 448 (1960)
159 A.2d 396
CHARLES SCHINCK, GUSTAVE PEARRIUS, WILBUR N. LAMPHIER AND WILLIAM BLAU, PLAINTIFFS-APPELLANTS,
v.
BOARD OF EDUCATION OF THE WESTWOOD CONSOLIDATED SCHOOL DISTRICT, FREDERICK M. RAUBINGER, STATE COMMISSIONER OF EDUCATION, AND BOARD OF LOCAL GOVERNMENT OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 15, 1960.
Decided March 28, 1960.
*452 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. William DeLorenzo, Jr., argued the cause for plaintiffs (Messrs. DeLorenzo & Garofalo, attorneys; Mr. DeLorenzo, on the brief).
*453 Mr. Lee A. Holley, Deputy Attorney General, argued the cause for defendants (Mr. David D. Furman, Attorney General, attorney for defendants Frederick M. Raubinger, State Commissioner of Education, and State Board of Local Government); Messrs. Evans, Hand & Evans, attorneys for defendant Board of Education of Westwood Consolidated School District (Mr. William W. Evans, Jr., of counsel; Mr. W. Fletcher Hock, Jr., on the brief); Mr. Frank J. Cuccio, attorney for the Inhabitants of Washington Township, amicus curiae, joining in the brief of defendant Board of Education.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
These appeals involve a review under R.R. 4:88-8 of the consents given by the State Commissioner of Education (hereinafter "Commissioner") and the State Local Government Board (hereinafter "Board") to a proposal for a new school bond issue, in excess of defendant school district's debt limit, acting under N.J.S.A. 18:5-86. Plaintiffs, who are residents and taxpayers of the Borough of Westwood, contest the adequacy of the proofs before these state administrative officials and the procedural propriety of the approval action taken by each of them. Additionally, plaintiffs challenge the constitutionality of N.J.S.A. 18:5-86 because it interposes an "alien will" between the Legislature and the electorate, contrary to our 1947 Constitution, Art. IV, Sec. I, par. 1, and because that section of the School Bond Law does not contain proper standards to guide the two agencies in carrying out their delegated functions.

I.
Much of the background of this case may be found in the opinion of this court in Botkin v. Westwood, 52 N.J. Super. 416 (1958), appeal dismissed 28 N.J. 218 (1958). A reading of that case will explain the dissatisfaction of many Westwood residents and taxpayers with the present school *454 arrangement and the proposed expansion of the school plant to be financed by the issuance of bonds. Plaintiffs reflect that dissatisfaction.
On July 1, 1951 the Borough of Westwood, formerly a receiving school district for its neighbor, Washington Township, joined with the latter in establishing defendant consolidated school district pursuant to N.J.S.A. 18:5-17.1 et seq. The Westwood Consolidated School District has operated from that date onward, there being no provision in our statutes for deconsolidation. Since its creation the school district has been faced with a ballooning school population in Washington Township, rendering existing school facilities entirely inadequate and creating an obvious need for more facilities. This problem has engaged the attention of local officials over the past few years. Various programs have been considered and certain steps taken to alleviate crowded schools. Two new elementary schools, both in Washington Township, were built, and additions made to two other elementary schools. Studies looking to a more complete solution of the local problem were undertaken, and citizen interest stimulated through committees and discussion. Defendant district board of education has continued to give the matter its undeviating attention.
In December 1958 a bond proposal referendum of $2,325,000 for a junior high school in Washington Township went before the voters and was defeated. Faced with the continuing need for additional school facilities, the school board, after careful study, adopted two proposals: (1) to build a new senior high school, and (2) to erect a third elementary school, both in Washington Township. The present Westwood High School was to be converted into a junior high school. The total cost of this program, $3,100,000, was to be financed by a bond issue.
There was a good deal of opposition to the plan by Westwood residents, apparently, among other reasons, because they would be obliged to pay for a large share of the cost of the proposed construction, while Washington Township, *455 a rapidly growing community, would enjoy most of the benefits. On November 2, 1959 the board of education, in compliance with N.J.S.A. 18:5-86(a), submitted both proposals to the Commissioner and the Board for approval and consent as required by subsections (c) and (d) of the statute.
Under the School Bond Law, a school district must meet certain financial conditions before it may authorize and issue new bonds for construction of facilities without prior state administrative approval. N.J.S.A. 18:5-84 and 85. When the net school debt of the district reaches a certain ceiling (6% or 8%) new bonds may not be authorized and issued until the Commissioner and the Board have endorsed their consents to the bond proposal. N.J.S.A. 18:5-86(c) provides:
"Within 60 days after submission to the State Commissioner of Education of a copy of a proposal or ordinance pursuant to subsection (b) of this section, he shall endorse his consent thereon if he shall be satisfied and shall record in writing his estimates that existing educational facilities in such school district are or within 5 years will be less than 80% adequate, that the new educational facilities to be financed pursuant to such proposal or ordinance will within 10 years be fully utilized, and that under existing statutes there is no alternative method of providing such new educational facilities which would be more economical. If the State Commissioner of Education shall not be so satisfied within said period of 60 days, he shall endorse his disapproval on such copy."
It will be seen that the Commissioner is primarily concerned with the need and feasibility of the proposed educational facilities.
The Board, in turn, investigates the financial stability of the school district and is required to make certain calculated estimates within the area of its administrative expertise. This can be seen from a reading of N.J.S.A. 18:5-86(d), which provides:
"Within 60 days after the submission to the Local Government Board of any copy of a proposal or ordinance pursuant to subsection *456 (b) of this section, it shall cause its consent to be endorsed thereon if it shall be satisfied and shall record by resolution its estimates that the amounts to be expended for the new educational facilities to be financed pursuant to such proposal or ordinance are not unreasonable or exorbitant, and that issuance of the bonds mentioned and described in such proposal or ordinance will not materially impair the credit of any municipality comprised within such school district or substantially reduce its ability during the ensuing 10 years to pay punctually the principal and interest of its debts and supply essential public improvements and services, and that authorization of such bonds would not be possible under the provisions of either section 18:5-84 or section 18:5-85 of this article, and that, taking into consideration trends in population and in values and uses of property and in needs for educational facilities, the net school debt of such school district will at some date within 20 years be less, in the case of a certified local school district, than 8%, or in the case of any other school district, than 6% of the average assessed valuation of property in such school district as stated in supplemental debt statements, which might be filed on such date. If the Local Government Board shall not be so satisfied within said period of 60 days, it shall cause its disapproval to be endorsed on such copy."
The Board is thus primarily concerned with the financial stability of the issuing district.
The record shows that the school district provided both the Commissioner and the Board with detailed information on forms supplied by these administrative agencies. Both held public hearings and afforded objectors an opportunity to appear. Although notice of these hearings was posted both in the borough and in the township, only one objector appeared before the Commissioner, and none before the Board. Following the hearings, and after considering the information and data submitted, the Commissioner endorsed his consent to the bond proposal on November 18, 1959, and the Board its consent on November 30. The proposals for the new senior high school and new elementary school were submitted to the voters at a referendum held December 9, 1959. Although Westwood voted against the proposals, they carried in the school district because of the preponderating favorable vote in Washington Township.

*457 II.
Plaintiffs contend that N.J.S.A. 18:5-86 is unconstitutional because it interposes an alien will between the Legislature and the voters. The argument is predicated upon Attorney-General v. McGuinness, 78 N.J.L. 346 (E. & A. 1910), and McCarthy v. Walter, 108 N.J.L. 282 (E. & A. 1931). McCarthy involved the Park Act of 1902 (c. 277), which provided that it was not to be submitted to the voters of any county for acceptance or rejection unless and until the freeholder board by resolution so determined. In ruling that the discretion so lodged in the freeholders was an alien will intervening between the Legislature and the electorate, the court adopted the language of the McGuinness case (78 N.J.L., at page 384):
"* * * the legislative will may be imposed as law upon municipalities, but, if any other will is to intervene between the legislature and such municipalities, it must be the will of the people who are to be governed by such law and not an alien will, even though it be that of the governing body for the time being of the municipality. * * *"
McGuinness concerned the former Civil Service Act (L. 1908, c. 156). Although holding that the law was valid insofar as it authorized municipalities and counties to adopt it by referendum, even though the statute involved delegation of some municipal governmental authority to a state commission, the Court of Errors and Appeals held the law unconstitutional as an improper delegation of legislative power to the local governing body by giving it the power to determine, in its discretion, whether the law should become effective. Thus, in both these leading cases, the voters were at the mercy of an independent will. Cf. Bucino v. Malone, 12 N.J. 330 (1953), holding constitutional the Faulkner Act, L. 1950, c. 210; N.J.S.A. 40:69A-1 et seq., and distinguishing the McCarthy and McGuinness cases.
A number of cases have limited the quoted holding of McGuinness solely to a delegation of law-making authority. *458 Where the act of the Legislature is complete, and the intervention of a will foreign thereto is not determinative of the operative effect of the law, the statute is unobjectionable on the constitutional ground advanced by plaintiffs. In Hartman v. Board of Chosen Freeholders, 127 N.J.L. 170 (Sup. Ct. 1941), acceptance by the freeholder board of custody and control of the county jail under authorizing legislation was held not to constitute a delegation of legislative power in contravention of Art. IV, Sec. I, par. 1 of the 1844 State Constitution. Eccles v. Egg Harbor Twp. Comm., 11 N.J. Misc. 698 (Sup. Ct. 1933), and Worth v. Westfield, 81 N.J.L. 301 (Sup. Ct. 1911), held that a governing body did not exercise a legislative power in determining whether to accept or adopt an act creating a board of assessors in lieu of a single assessor. Our former highest court, in Hayes v. Hoboken, 93 N.J.L. 432 (E. & A. 1919), held constitutional an enabling statute allowing an intervening determination as to whether a police pension system should be adopted. L. 1916, c. 144. It reached a similar result in Noonan v. Hudson County Freeholder Board, 52 N.J.L. 398 (E. & A. 1890), involving an act which gave the freeholder board the right to determine whether a proposal to construct a county road should be submitted to the voters. Wilson v. Collingswood, 81 N.J.L. 634 (E. & A. 1911), affirming 80 N.J.L. 626 (Sup. Ct. 1910), concerned a statute requiring a proposal for the construction of water works in a borough, as well as the bond issue needed to finance the program, to be submitted to the voters for their approval. State Board of Health and State Water Supply Commission approval of the proposed water works was also required. Although the court did not deal with the issue here raised by plaintiffs, the decision reflects an understanding of the principle we have just discussed.
Our present Supreme Court has considered the operation of N.J.S.A. 18:5-86 on two separate occasions and reviewed both the functions to be performed by administrative regulation, Citizens to Protect Public Funds v. Parsippany-Troy *459 Hills Bd. of Education, 13 N.J. 172, 177 (1953), and the legislative standards, Kenilworth v. Raubinger, 15 N.J. 581, 586 (1954). Kenilworth was a case similar to this one, but the constitutional issue was not raised. In the light of these two cases, it would seem reasonable to say that the constitutional defects claimed to inhere in N.J.S.A. 18:5-86 have not been so obvious as to suggest themselves until plaintiffs brought this action. In neither case did the court admit of any doubts about the validity of the statute.
The functions to be discharged by the Commissioner and the Board under the statute in question can hardly be classified as legislative. Nor do we consider that the statutory mandate to act within certain standards allowed them untrammeled discretion. The provision of the School Bond Law under attack is clearly distinguishable from cases where the law does or does not become effective at the discretion of an alien will. Here the state agencies do not exercise volition as to whether the referendum shall or shall not take place. They merely determine whether or not there exist certain conditions specified by the Legislature relevant to the necessity of the proposed program and the school district's capacity to finance it without undue fiscal difficulty.
The School Bond Law is, of course, operative in every school district, from the moment of its creation. The only question here is whether a proposal for a new bond issue shall be submitted to the voters after certain standards are satisfied. McGuinness and McCarthy, above, recognized this distinction. When the Faulkner Act was attacked in Bucino v. Malone, above, the Supreme Court clearly pointed out that the alien will which was there alleged to exist merely selected and recommended, but it did not legislate or adopt the law. 12 N.J., at page 339.
We cannot subscribe to the proposition advanced by plaintiffs that the Legislature may not delegate certain fact-finding functions to an administrative agency like the Commissioner or the Board as part of the legislative direction regarding *460 the circumstances under which bonds may be issued for school construction purposes in a specified category of school districts. Involved here is the will of the Legislature on the one hand, and the will of the electorate on the other  nothing more. The Legislature has said that when certain conditions precedent are met, the electorate of a school district may vote to authorize issuance of school bonds even though such issue will bring the district's school debt above the statutory limit. Instead of reserving to itself the burdensome and complicated task of deciding whether the required conditions have been fulfilled in each case where a bond issue is proposed  and such proposals are numerous in these days of expanding school plant  the Legislature in its wisdom decided to entrust this task to administrative agencies who possess the background and skill necessary to handle such problems with maximum facility and expertness.
Thus, under subsection (c) of N.J.S.A. 18:5-86, the Commissioner is required to record in writing his estimates that existing educational facilities are or within five years will be less than 80% adequate; that the new educational facilities will be fully utilized within ten years; and that under existing statutes there is no more economical way of providing for such new facilities. And under subsection (d) the Board is required to record by resolution its estimates that the amounts to be expended for the new facilities are not unreasonable or exorbitant; that the new issue of bonds will not materially impair the credit of any municipality comprised within the school district or substantially reduce its ability during the ensuing ten years to pay punctually the principal and interest of its debts and supply essential public improvements and services; that it is impossible to authorize the bonds under other statutory provisions; and that taking into consideration trends in population and in the values and uses of property and in needs for educational facilities, the net school debt of the school district will, within 20 years, be less than the authorized debt limit. See Kenilworth v. Raubinger, 15 N.J., at pages 586-9.
*461 None of these estimates is a matter of pure discretion with the two agencies involved. They involve passing upon conditions of fact in the light of expert administrative judgment. The Legislature may delegate such fact-finding functions to an administrative agency. See Little Ferry v. Bergen County Sewer Authority, 9 N.J. 536, 543-4 (1952), certiorari denied 344 U.S. 865, 73 S.Ct. 105, 97 L.Ed. 670 (1952); Jamouneau v. Harner, 16 N.J. 500, 523-5 (1954); Berkeley Heights Township v. Board of Education, 23 N.J. 276, 283-4 (1957).

III.
Plaintiffs next claim that N.J.S.A. 18:5-86 is invalid because it does not contain proper standards to guide the Commissioner and the Board in carrying out their respective delegated functions. Defendants do not dispute the general proposition that there must be adequate administrative standards. Plaintiffs have supplied us with a comprehensive list of recent decisions dealing with the question of adequate standards. Examining those cases in the light of the instant situation, it must be concluded that they do not support their claim.
In only five of the cases cited to us did the statutes succumb to the constitutional attack made on the basis of inadequate standards. Jamouneau v. Local Government Board, 6 N.J. 281 (1951), and Van Riper v. Traffic Tel. Workers' Fed. of N.J., 2 N.J. 335 (1949), involved statutes where there was a total absence of any standards or norms to guide the respondent administrators. Plaintiffs cannot, and indeed do not, make any claim that N.J.S.A. 18:5-86(c) and (d) contain no standards whatever.
Finn v. Clifton, 136 N.J.L. 34 (E. & A. 1947), concerned an ordinance prohibiting gas stations "unless permission is first obtained from the Municipal Council." The ordinance provided no standards to guide the council, except that it could not grant permission unless the fire and police *462 departments first certified that the proposed station would not create a fire or traffic hazard. The court ruled that the ordinance could not be sustained as resting upon the general police powers since it did not lay down a sufficient norm or standard for the guidance of the governing body. Cf. Moyant v. Paramus, 30 N.J. 528 (1959), where the court approved an ordinance in which approval or disapproval of a solicitor's license by the police chief was to be based on his investigation of the applicant's "business and moral character * * * as he deems necessary for the protection of the public good." If the police chief found the applicant's character and business responsibility "satisfactory," he was to approve the application. The criterion of satisfactory business and moral character was upheld in light of the whole ordinance and its objectives.
Fourth among the five cases we have mentioned is Hoboken v. Martin, 123 N.J.L. 442 (E. & A. 1939), which condemned a legislative direction to the State Tax Commissioner, under L. 1938, cc. 7 and 8, to fix values to provide "a unit of measure for a fair and equitable apportionment" of excise taxes, so that the taxes would be "fairly and equitably apportioned upon a uniform basis among the municipalities entitled thereto." The court held that other than the Commissioner's own conception of a fair and equitable apportionment, there were no standards or rules to guide his determination. Cf. Newark v. N.J. Turnpike Authority, 7 N.J. 377, 383-5 (1951), appeal dismissed 342 U.S. 874, 72 S.Ct. 168, 96 L.Ed. 657 (1951), where the Turnpike Authority Act, L. 1948, c. 454, § 5(j), provided that the Authority could condemn any land "which it may determine is reasonably necessary" for its projects. This language was held not objectionable.
Finally, in New Jersey Used Car Trade Ass'n v. Magee, 1 N.J. Super. 371 (Ch. Div. 1948), the attack was on the provision of the Motor Vehicle Certificate of Ownership Law, N.J.S.A. 39:10-19, which required the maintenance of "a place of business consisting of a permanent building" *463 with not less than 1,000 square feet of floor space, as a prerequisite of eligibility for a motor vehicle dealer's license. This provision was held unconstitutional because "permanent building" was too vague a term to serve as an acceptable standard for the guidance of the agency created to administer the law. We agree with the Attorney General that such a ruling as to necessary precision of legislative language is not appropriately applicable to estimates regarding future school population, the economics of providing new educational facilities or the reasonableness of their cost, municipal credit impairment and fiscal ability, or predicted debt situations  with all of which N.J.S.A. 18:5-86 is concerned.
Recent years have witnessed an increasing liberality in the approach of our courts toward the construction of legislative delegations of power. The keynote was struck in Ward v. Scott, 11 N.J. 117, 123-4 (1952), where Justice Jacobs observed that "the exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power." The court is not confined to the specific terms of the challenged subsection, "but must examine the entire act in the light of its surroundings and objectives." Nor, he continued, is it "restricted to the ascertainment of standards in express terms if they may be reasonably implied from the entire act." And see Moyant v. Paramus, above, 30 N.J., at page 553, where it was said that standards "need not be minutely detailed."
Ward v. Scott, above, upheld the constitutionality of N.J.S.A. 40:55-39(d) against a challenge of the delegation to the board of adjustment of power to recommend a variance subject to approval or disapproval of the municipal governing body. The court, in the light of the entire Zoning Act, approved a statutory standard for board recommendation of a variance "in particular cases and for special reasons," provided such action was "without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."
*464 Schierstead v. Brigantine, 20 N.J. 164 (1955), involved a test of the constitutionality of the Municipal Finance Commission Law, N.J.S.A. 52:27-29.1, which allows subject municipalities to sell, exchange or otherwise dispose of tax sale certificates or tax titles "upon the express consent in writing of the commission." The court examined the act in its entirety, in the light of what had been said in Ward v. Scott, and found sufficient standards to guide the Commission. The challenged subsection was held not to constitute a grant of uncontrolled power to the agency.
We have already adverted to Kenilworth v. Raubinger, involving the very statute here under consideration, and Citizens to Protect Public Funds v. Parsippany-Troy Hills Board of Education.
Certainly, the same result as flowed from a consideration of the adequacy of the standard expressed in the statutes involved in Ward and Schierstead, should follow here from an analysis of N.J.S.A. 18:5-86 and its accompanying provisions, N.J.S.A. 18:5-84, 85, 87 and 88. There is the further consideration that a statute which has been in force for many years, and under which many bond issues have undoubtedly been authorized and floated, should not be declared unconstitutional unless it is obviously defective. Legg v. Passaic County, 122 N.J.L. 100, 104 (Sup. Ct. 1939), affirmed 123 N.J.L. 263 (E. & A. 1939).
Plaintiffs specifically contest two phrases in N.J.S.A. 18:5-86(d), the subsection which guides the Board, as inadequate expressions of guiding standards. These are: "materially impair" and "trends."
In arguing that "materially impair" is an improper standard, plaintiffs ask: "Just when is the credit of a municipality materially impaired? Must it be bankrupt? If not, at what point does it become so? At what debt ratio?" As defendants properly observe, these are hypothetical questions which could be addressed to a number of legislative standards approved in recent cases: e.g., "satisfactory business and moral character," Moyant v. Paramus, above; "in the *465 public interest," Elizabeth Federal S. & L. Ass'n v. Howell, 30 N.J. 190 (1959); "appropriate and useful," State v. Lanza, 27 N.J. 516 (1958), appeal dismissed 358 U.S. 333, 79 S.Ct. 351, 3 L.Ed.2d 350 (1959); "for cause," In re Berardi, 23 N.J. 485 (1957); "necessary and proper for the public convenience," In re Greenville Bus Co., 17 N.J. 131 (1954); and "reasonable return," State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504 (E. & A. 1935). In each case the phrase in question was attacked as constitutionally invalid, and sustained in the light of the entire act. The mere circumstance that a phrase, considered in the abstract, is somewhat general, is no reason to hold that the statute containing it is necessarily defective.
The Local Government Board must be presumed to have a large degree of expert administrative knowledge concerning local financial affairs. It annually passes upon local budgets. It concerns itself constantly with the fiscal health of municipalities, with temporary financing, and with bond issues. It is unrealistic to assert that "materially impair" does not have a clear meaning to the Board, or is so broad as to permit arbitrary action, whether that term be applied to the credit of the municipality, its ability to pay debts, or its ability to provide essential improvements and services. Of necessity, the Legislature could not spell out with mathematical precision the exact point when further indebtedness would endanger the financial stability of a municipality. Such a determination must be based upon such factors as the character and age of a community, its assessment burden and its tax collection rate, the ratio of debt to average assessed valuation, and a multitude of other matters with which the Board concerned itself in this case. It is precisely because of the Board's wide knowledge of municipal affairs and its expertness that the Legislature chose to entrust the determination to be made under N.J.S.A. 18:5-86(d) to that specialized administrative body.
Plaintiffs also contend that the use of the word "trends," in the provision of N.J.S.A. 18:5-86(d) requiring the *466 Board to take into consideration "trends in population and in values and in uses of property and in needs for educational facilities," provides an improper administrative standard. They rely on N.J. Bell Tel. Co. v. Communications Workers, etc., 5 N.J. 354 (1950).
Initially, we observe that the trends to be considered were not, as such, constituents of the legislative standard to be satisfied. A reading of subsection (d) will clearly show that the standards controlling the Board were (as noted above) that the sums to be expended for the new educational facilities to be financed by the bond issue were not unreasonable or exorbitant; that the issuance of the bonds would not materially impair the credit of any municipality within the school district or substantially reduce its ability to meet its debt service punctually during the ensuing ten years and to supply essential public improvements and services; that authorization of the bonds would not be possible under any other statutory provision; and, finally, after considering the trends just mentioned, that the net school debt of the district within the next 20 years would be less than the 6% (or 8%) limit fixed. "Trends" were merely certain aspects of the whole community fiscal picture that the Legislature specifically directed the Board to consider.
The N.J. Bell Tel. Co. case is not in point. There the administrative agency was not directed by statute to consider "trends" in making its determination. The court was not concerned with trends as a statutory standard, but rather objected to an administrative determination based solely upon trends in employment conditions in view of the express requirement that the agency consider objective factors. The holding was that the agency had not applied all the prescribed legislative standards to the matters in dispute, and so there was no proper support for its conclusion. There was no determination by the court that "trends" were necessarily improper factors in the setting of legislative standards accompanying a delegation of powers. The court merely criticized the pertinence of trends of wages in the determination *467 by a statutory board of arbitration of the issues in a strike affecting a public utility.
The pertinence of the trends here required by the Legislature to be considered in determining the likelihood of the net school debt of the district falling below a designated percentage of assessed valuations within 20 years is obvious, and the requirement is therefore a reasonable and proper element of the standard. Compare Little Ferry v. Bergen County Sewer Authority, above (9 N.J. 536), where the standards sustained included the provision "Whenever * * * in the judgment of the board of chosen freeholders of the county, the pollution [of a river] is, or is likely to become, a threat to the public health of the communities within such drainage area * * *" (italics ours), N.J.S.A. 40:36A-1. The Supreme Court found no fault with the standard.

IV.
Plaintiffs further claim that the proceedings before the Commissioner and the Board were procedurally inadequate in that the estimates made were not based on detailed subordinate written findings, and the conclusions they arrived at in signifying the statutory consents were not supported by adequate evidence.
There was a similar attack made on the proceedings before the Commissioner and the Board in Kenilworth v. Raubinger, above, 15 N.J. 581 (1954). In that case the procedure followed and the records compiled were almost identical to those here. See 279 Supreme Court of New Jersey Briefs (case No. 5), New Jersey State Library. Upon the same kind of record as we have before us the Supreme Court in Kenilworth not only found adequate evidence to support the statutory requirements of N.J.S.A. 18:5-86, but also approved administrative action by the Commissioner and the Board which did not encompass subordinate findings of fact, the formal hearing requirements of administration of oaths and a complete transcript, or, indeed, any of the *468 requirements which plaintiffs now insist are necessary to the consents given.
Plaintiffs also assert there was no hearing before either agency. The record shows there were, despite the fact that the statute does not call for a hearing.
In support of their contention that the Commissioner and the Board should respectively have made findings of fact, plaintiffs cite In re Hackensack Water Co., 41 N.J. Super. 408 (App. Div. 1956), and Family Finance Corp. v. Gough, 10 N.J. Super. 13 (App. Div. 1950). In the former case, the statute expressly required a hearing; in the latter Judge (now Justice) Jacobs found, from a consideration of the statute, that a hearing was required, stating:
"The appellant contends that the respondent erred in failing to make basic findings of fact. It is clear that where the governing statute contains express or implied requirement for such findings they must be present to sustain the administrative agency's order. * * * The problem is more troublesome where legislative requirement is absent. * * * It is generally recognized that in such situations no findings are necessary to support rules and regulations which are deemed legislative in nature. * * * However, when dealing with administrative action which affects a named party and is adjudicatory in nature * * *, there is authority which expresses, in comprehensive language, the view that it must be accompanied by basic findings of fact sufficient to support it. * * *" (citations omitted; 10 N.J. Super., at pages 23-24)
N.J.S.A. 18:5-86 does not require findings of fact; it calls merely for the recording of written estimates, which were made. Nor does a reading of the School Bond Act indicate an implied requirement for findings of subordinate facts to sustain the consents given. Considering the matter in the light of what was said by Justice Jacobs in the latter part of the quotation from the Family Finance decision, not only does the present matter not involve an action affecting a named party's rights, but the administrative action taken cannot be considered adjudicatory in nature, in the sense of a contested adversary proceeding. The proceedings before the Commissioner and the Board were not quasi-judicial in *469 character; all that these legislative agents did was to determine whether the requirements laid down by the Legislature had fairly been met so that a governmental act, essentially legislative in nature, might be effectuated with appropriate safeguards. Cf. N.J. Mfrs. Cas. Ins. Co. v. Holderman, 54 N.J. Super. 260, 266, 268 (App. Div. 1959).
As we read the Kenilworth case, our only concern on a review of this nature is with the adequacy of the evidence presented to the Commissioner and the Board and which served as a basis for their estimates. In the light of that decision and our reading of the School Bond Law as a whole, we do not consider that such evidence had to establish conclusively the existence of the statutory prerequisites. It was necessary only that the Commissioner and the Board, applying their administrative expertise, be satisfied in good faith that the conditions of the act had been met. As was said by Justice Brennan in Kenilworth, "The key word in this provision is `estimates.' Plainly the Legislature did not contemplate that the proposal incorporate a guarantee * * *." 15 N.J., at pages 586-7.
As the Attorney General points out, the present School Bond Law, L. 1946, c. 260, has been operative for better than a dozen years. We have no exact figure as to the total amount of school district financing which has been approved through the procedures required by this statute, but we are assured that it runs into several hundred millions of dollars. The actions of the Commissioner and Board in executing the administrative function entrusted to their expertise has gone unchallenged since 1946, except for two instances when the identical procedures used in the instant case received careful judicial review and approval. We refer, of course, to the two cases already mentioned  the Kenilworth decision and Citizens to Protect Public Funds v. Parsippany-Troy Hills Bd. of Education. Accordingly, unless plaintiffs show a clear abuse of discretion or deviation from the course of administrative conduct that has been recognized as proper, the actions taken by the Commissioner and the Board should be approved.
*470 Before proceeding to a consideration of plaintiffs' argument that the consents of the Commissioner and the Board are not supported by adequate evidence, it is not inappropriate to observe that this appeal represents the first time that plaintiffs have made any objection to what these administrative agencies did. Though not required by statute, both the Commissioner and the Board gave notice that there would be a hearing, and thus afforded all interested objectors an opportunity to appear and present their views. There was but one person who appeared to object, and he before the Commissioner only. He does not appeal. Plaintiffs chose not to participate in the administrative proceedings, so as to raise the issue of adequacy of proof they now press upon us.
Not only did plaintiffs fail to present any legal argument before the Commissioner and the Board, or to come forward with proofs which would show that the proposed school program did not meet the statutory requirements, but even here they fail to point out just what there is in the array of information and statistics comprising the record which would establish that there has been an abuse of administrative responsibility. Asked at the oral argument to pinpoint what was wrong, on the merits, with the determinations of the two state agencies, the best plaintiffs could offer was that the tax rate in Westwood would increase from $10.91 in 1959 to $16.47 in 1966, and that their municipality would not greatly benefit from the building program because a large number of its inhabitants were "senior citizens." Plaintiffs have wholly failed to show that any of the estimates made by the Commissioner and the Board were wrong.

V.
We come, then, to the question of whether the administrative actions find their support in adequate evidence.
Plaintiffs make the flat claim that there is a "total absence of anything in the record to support the Commissioner's estimate." The argument is completely without foundation. *471 Accompanying the application made to the Commissioner for his consent was a copy of the resolution of defendant district board of education setting out the proposals for the new senior high school and the new elementary school, with a comprehensive array of supporting data. All this was before the Commissioner at the hearing scheduled for November 5, at which the board of education was represented by its president and two members, its superintendent of schools, auditor, secretary, attorney and architect. Five citizens were present, as well as the secretary of the Local Government Board.
The superintendent presented a statement of the school district problem and the board of education's solution. The auditor testified to the impact of the proposed bond issue on the constituent municipalities. He said that the district would come within its borrowing capacity within 20 years, and the new bonds would not materially impair the credit of either municipality. The architect stated that the cost of the proposed buildings was not unreasonable or exorbitant. The Commissioner also had available a copy of the architect's report. One member of the board of education read a statement in opposition to the proposal; his argument, in the main, was based upon local interests and questions of individual convenience, rather than on the statutory standards.
The record shows that the Commissioner had a wealth of detailed information entirely sufficient to support the estimates he had to make under N.J.S.A. 18:5-86(c). Taking the three requirements of the statute in the order in which they are set out, the evidence before the Commissioner was entirely adequate to establish the following:
(1) The existing educational facilities in the school district will be less than 80% adequate within five years. No one disputed the present inadequacy of the facilities available to defendant school district. At the time of the hearing before the Commissioner the school system was operating on extended sessions, with over 200 pupils forced to utilize substandard classrooms. The figures reflect that *472 there will be a large increase in school population. Past and present enrollments give credence to that expectation. If the predicted attendance increase occurs, additional extended and perhaps split sessions will be necessary. The school board member who appeared at the hearing to object admitted the present inadequacy of the facilities, but his solution was a further overlapping of sessions. The president of the school board testified that in his opinion the facilities would be inadequate within the next five years.
(2) The proposed new school facilities will be fully utilized within ten years. The Commissioner had before him a comprehensive outline of present school facilities, and detailed plans for the proposed new facilities. He also had the statistics of present and projected future pupil population, as well as facts indicating the past and potential expansion in Westwood and Washington Township. The board president gave his considered opinion on the future utilization of the facilities.
(3) There is no more economically feasible alternative plan possible under existing statutes. Here, as under (1) and (2), the Commissioner was called upon to exercise a practiced judgment in the very special field of school planning. He had before him the complete plans and costs of the proposed projects. In addition, he had the architect's report and an opportunity to question the architect at the hearing. No alternative plan was submitted. (Here we again recall that another plan, put before the electorate in 1958, was defeated.) The Commissioner conducted his own investigation into the objections raised against the present plan. He also had the assurance from the local school board that no other plan existed.
The Commissioner was satisfied with the proofs presented and, recording his estimates that the condition of subsection (c) of the statute had been met, endorsed his consent on the proposals on November 18, 1959. We find that there was ample supporting data before the Commissioner to enable him to arrive at and justify his estimates.
*473 Like the Commissioner, the Local Government Board had before it the application, the resolution authorizing the submission of the two proposals for the new facilities, and an elaborate array of supporting data, together with the endorsed consent of the Commissioner. It scheduled a hearing for November 30, notice thereof being posted in the two municipalities. At the hearing the district board of education was represented by two members, its superintendent of schools, auditor, secretary, attorney and architect. Two citizens were present. The superintendent again presented a statement on the school district problem and the board of education's proposed solution. The auditor and the citizens testified that the municipalities could afford the additional school facilities.
We proceed to consider the several estimates which the Board was required to make under N.J.S.A. 18:5-86(d), in the order in which they appear in the statute.
(1) The cost of the new educational facilities to be financed by a bond issue is not unreasonable or exorbitant. The determination of this question necessarily implicated a balancing of relevant facts before the Board, among them the growth of the communities, their financial stability, the need for school facilities in view of prospective rising costs, the existing debts and projected debt service for each municipality, debts that reasonably could be expected to be incurred for other essential public improvements and services, and the cost of the new facilities themselves.
The record before the Board contains information in great detail concerning the proposed bond issue, accompanied by a schedule of interest and principal payments; an account of all of the indebtedness issued and outstanding in the two municipalities; a summary of all outstanding and municipal school debt service; an analysis of each municipality's assessed valuations, tax assessments, tax collection experience, and estimated tax rates in future years if the new facilities were built; the status of the present school facilities; and also a supplemental debt statement for each municipality, *474 prepared as of the date of the proposed referendum. At the Board's request, the school district submitted additional data at the hearing to give a particularized breakdown of the projected cost of each of the proposed new buildings. In addition to all this, the Board had for its consideration the detailed cost of the new facilities to show the dollar cost in terms of space provided.
(2) The proposed bond issue would not materially impair the credit of the municipalities or substantially reduce the ability of either to meet debt service during the next ten years and to supply essential public improvements and services. All of the material just mentioned under (1) had of necessity to be considered by the Board in making this estimate. Whether the new bond issue would impair municipal credit, or affect either municipality's ability within the next decade to pay its debts and to provide necessary improvements and services, depended upon a balancing of the many elements included in the information given the Board relating to proposed cost, existing debt, projected debt, percentage of total net debt to assessed valuation, tax collections, and the like. The Board undoubtedly considered that the municipalities had an assessed valuation ratio of 22% or 23% of true value. This percentage would decrease as the ratio of assessed valuation approached 100%. The Board also considered the need for other municipal improvements and services.
Here we repeat what has already been said as to the Board's ongoing intimate knowledge of the fiscal affairs of both municipalities, in the light of its jurisdiction over annual municipal debt statements and budgets under the Local Budget Law, R.S. 40:2-1 et seq., as amended, and its regulatory authority under the Local Bond Law, R.S. 40:1-1 et seq., as amended. The Board also exercises a wide range of functions that afford a familiarity with the debt condition of local governments. N.J.S.A. 52:27BB-1 et seq.
*475 (3) Bonds may not presently be issued under N.J.S.A. 18:5-84 or 85. To qualify for consideration under N.J.S.A. 18:5-86, a school district must be in a position of not being able to issue bonds pursuant to the lesser restrictions of the two preceding sections of the School Bond Law. Even more obvious than the inexorable rise in school population in the Westwood Consolidated School District and the complete inadequacy of present school facilities is the fact that the net school debt in both Washington Township and Westwood now exceeds 8% of the average assessed valuations. Bonds may therefore not be issued under N.J.S.A. 18:5-84. Nor is there any question that the percentage of net school debt, revealed in the supplemental debt statement as of December 8, 1959, exceeds 7% of the average assessed valuations, so that bonds may not be issued pursuant to N.J.S.A. 18:5-85.
(4) The net school debt will in the next 20 years fall within the statutory limitations. In light of the information made available to it, including material concerning increasing property values, the growth of the two communities, and their present debt structure, there was certainly adequate evidence before the Board on which to base its estimate of the debt picture during the next 20 years. Further, the statistical information given the Board clearly showed that by October 31, 1979 the outstanding school debt as estimated, with the proposed bond issue included, would be within the 8% figure of the present assessed valuations (based on a 22% ratio), as opposed to projected assessed valuations 20 years hence.
We note that in making its estimate under this heading the Board is called upon to determine whether the net school debt of the school district will at some date within 20 years be less than the statutory limitation "as stated in supplemental debt statements, which might be filed on such date." In arriving at a calculated judgment as to what the situation will be within the next two decades, the Board, of course, calls to its aid all the experience it has had in the field of *476 local government finances, and the information it derives under the powers given it by the Local Budget Law, the Local Bond Law, and under N.J.S.A. 52:27BB-1 et seq., already referred to.
We entertain no doubt whatsoever that the Local Government Board, like the Commissioner of Education, based its estimates upon entirely adequate and substantial evidence. We find no merit in plaintiffs' broad and unspecified attack upon the determination of these two administrative agencies.
We are mindful of the general principle that on appellate review we should not substitute our judgment for the specialized and expert judgment of the Commissioner and the Board, and also of the local school board, all of whom have been entrusted with the fulfillment of the legislative policy. To do so would constitute a judicial exercise of the administrative function. Cf. Grundlehner v. Dangler, 29 N.J. 256, 266 (1959); In re Plainfield-Union Water Co., 14 N.J. 296, 307-8 (1954). We also recall that the estimates required of the administrative agencies under N.J.S.A. 18:5-86(c) and (d) are not guarantees. We conclude that the estimates of the Commissioner and the Board as to the need for the proposed facilities and the propriety of the proposed financing are not arbitrary or unreasonable. There has been no abuse of the statutory power.
Affirmed, without costs.